No. 26-2029

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS; LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND; LEAGUE OF WOMEN VOTERS OF THE UNITED STATES; LEAGUE OF WOMEN VOTERS EDUCATION FUND; ASSOCIATION OF AMERICANS RESIDENT OVERSEAS; U.S. VOTE FOUNDATION; OCA-ASIAN PACIFIC AMERICAN ADVOCATES; DELTA SIGMA THETA SORORITY, INC.,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES POSTAL SERVICE; UNITED STATES POSTAL SERVICE BOARD OF GOVERNORS; DAVID STEINER, in the official capacity as Postmaster General; DOUGLAS A. TULINO, in the official capacity as Deputy Postmaster General; AMBER F. MCREYNOLDS, in the official capacity as Chairwoman of the Board of Governors of the United States Postal Service; DEREK T. KAN, in the official capacity as the Vice Chairman of the Board of Governors of the United States Postal Service; RONALD A. STROMAN, in the official capacity as a member of the Board of Governors of the United States Postal Service; DANIEL M. TANGHERLINI, in the official capacity as a member of the Board of Governors of the United States Postal Service; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as the Secretary of the Department of Homeland Security; SOCIAL SECURITY ADMINISTRATION; FRANK J. BISIGNANO, in the official capacity as Commissioner of the Social Security Administration; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in the official capacity as Director of U.S. Citizenship and Immigration Services,

Defendants - Appellants,

STATE OF MISSOURI; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,

Defendants.

On Appeal from the United States District Court
for the District of Massachusetts

# EMERGENCY MOTION FOR STAY PENDING APPEAL

BRETT A. SHUMATE
*Assistant Attorney General*
ERIC D. MCARTHUR
*Deputy Assistant Attorney General*
BRAD HINSHELWOOD
LAURA E. MYRON
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

STATEMENT .......... 3

I. Regulatory Background Rule Is Lawful .......... 3

II. Factual and Procedural Background .......... 6

ARGUMENT .......... 7

I. The Government Is Likely to Succeed on the Merits Because the Final Rule Is Lawful .......... 7

A. The Final Rule is authorized by statute .......... 7

B. The Final Rule is consistent with the Constitution .......... 15

II. The Remaining Factors Warrant a Stay .......... 17

CONCLUSION .......... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DISTRICT COURT OPINION AND ORDER

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States Postal Service (USPS) promulgated a Final Rule imposing modest envelope-design and data-reporting standards for federal ballot mail for States that wish to transmit ballots via U.S. mail. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026). The Rule creates standardized design and review requirements for ballot envelopes that build on practices long recommended by USPS, some of which are already in use in many States (including many of the plaintiffs here). In particular, the Rule requires that envelopes include the official Election Mail logo, be automation compatible—so that they can be processed by USPS's high-speed mail processing equipment—and use unique barcodes. *Id.* at 54,990-91. And it requires States to upload the name-and-address information of intended recipients of ballot mail—information that all election officials sending ballot mail necessarily already possess—as well as the unique barcode number, into an online portal. *Id.*

A group of States (*California v. USPS*, No. 26-2301) and organizations (*League of Women Voters (LWVM) v. Trump*, No. 26-2029) challenged the Rule premised largely on the theory—seemingly formed months before the Rule was issued—that USPS intends to seize control of the administration of federal elections. It does not. The Rule allows States—not USPS—to identify which voters should receive mail ballots. USPS will not scrutinize those decisions, determine voter eligibility, ballot content, mailing or receipt deadlines, or ballot-counting procedures. Compliance with the

Rule's modest envelope design and informational requirements need not and should not prevent a single voter from voting by mail.

Nevertheless, last week, the district court granted plaintiffs' motion for a temporary restraining order (TRO), which defendants sought to stay. The district court has now issued a preliminary injunction premised on essentially the same reasoning. *California* Dkt. 156; *League of Women Voters* Dkt. 285 (hereinafter "Op.").

The court's holding is gravely mistaken. The Rule's improvements and modernizations of USPS's handling of this particularly sensitive category of mail are fully consistent with USPS's statutory and constitutional authority. USPS has longstanding authority to "adopt . . . such rules and regulations . . . as may be necessary in the execution of its functions," 39 U.S.C. § 401(2), which include "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail." *Id.* § 404(a)(1). USPS has previously wielded that authority to issue design and mail-preparation requirements for other types of mail that are sensitive yet non-dangerous, such as cremated remains or replica explosives. And USPS has also previously taken election mail-specific actions surrounding envelope design and processing, such as recommending the use of the Election Mail logo and prioritizing ballot mail for processing and delivery. There is no material distinction between those prior actions and this one with respect to USPS's legal authority.

A stay pending appeal is warranted. Under the district court's order, while the government may continue to review envelope design and facilitate use of the online

portal by States that wish to use those processes, it may not implement the Rule's verification process even for States that would voluntarily participate. The government suffers irreparable harm; the injunction threatens USPS's ability to implement the Rule's beneficial practices for upcoming ballot mail, even if it is later stayed or vacated. These harms accrue with each passing day and cannot be remedied by appellate review in the ordinary course, which would "come far too late." *California*, 2026 WL 2473573, at *4. Because the "most critical" stay factors favor the defendants, *Nken v. Holder*, 556 U.S. 418, 434 (2009), plaintiffs' asserted harms from the Rule (even if credited) cannot be sufficient to defeat a stay of an improper injunction of a lawful rule. This Court should grant an immediate administrative stay and a full stay pending further review.

## STATEMENT

### I. Regulatory Background

Congress has empowered USPS to "adopt . . . such rules and regulations . . . as may be necessary in the execution of its functions under this title and such other functions as may be assigned to [USPS] under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress also provided USPS "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). One of those specific powers is "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

Exercising this delegated authority, the Final Rule amends USPS's Domestic Mail Manual to impose modest reporting and design requirements on federal ballot mail envelopes. The Rule requires federal ballots transmitted through the U.S. mail to be mailed in envelopes that include the official Election Mail logo, are automation compatible, and use unique barcodes. *See* 91 Fed. Reg. at 54,990-91. When outbound federal ballot mail is presented for mailing, USPS will match the sampled barcode data to the portal data, to ensure compliance with the Rule. *Id.* at 54,990-91. All mailings that comply with these requirements will be accepted; those that do not will be "returned to the authorized ballot mailer" who may then "address the error(s)" and "resubmit[] the mailing." *Id.* at 54,991.

USPS will not perform any verification of voter eligibility; its role is limited to ensuring that envelopes comply with the Rule's design requirements. As the Rule emphasizes, "[e]ligible voters will therefore be listed [in the Portal] by and at the discretion of election officials, and USPS will not second-guess the states' submissions. State election officials will thus retain full control over who is permitted to vote in federal elections in their state by U.S. mail." 91 Fed. Reg. at 54,969. States likewise need not worry about the accuracy of lists maintained within USPS—all lists will consist solely of information provided by the States alone. On or near the date of the election, USPS will also provide each State that uses the U.S. mail to transport ballots with a single list containing the State's submissions of the ballots it intends to send. *Id.* at 54,982.

Several features of this Rule are not new. For years, USPS has recommended that ballot mail envelopes use unique barcodes, be automation compatible, include the official Election Mail logo, and undergo mailpiece design review in advance of mailing. *See* USPS, Kit 600: *Official Election Mail Guide* (Kit 600), https://about.usps.com/kits/kit600.pdf; *Domestic Mail Manual* 703.8.0, https://pe.usps.com/text/dmm300/703.htm#ep1174014. This Rule simply turns "these longstanding recommendations"—which some of the State plaintiffs have already adopted, at least in part—into requirements. 91 Fed. Reg. at 54,986; *see id.* at 54,978. These requirements are only a baseline; "nothing in the [R]ule prevents or discourages election officials from including envelope design elements required by state law," nor will the Rule "create a single, uniform ballot envelope design across all states[.]" *Id.* at 54,978. And most importantly, the Rule "leav[es] the administration of elections firmly in the hands of the [S]tates." *Id.* at 54,970. USPS "will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots." *Id.* at 54,978.

The Rule explains that these requirements "will afford significantly enhanced visibility into the sending of Federal Ballot Mail, and this will in turn facilitate law enforcement efforts by enabling law enforcement to better detect potential issues meriting further investigation." *Id.* at 54,969. Ultimately, "[w]hether or not voter fraud is common or uncommon," the Rule is intended "to facilitate enforcement of federal law, reduce the risk of fraud, and help protect the integrity of federal

elections," *id.*—at least with respect to the narrow but important role played by USPS in States that choose to send ballots by U.S. mail.

## II. Factual and Procedural Background

These suits began as challenges to Executive Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026), which, among other things, directed USPS to "'initiate a proposed rulemaking'" related to election mail, *Trump v. California*, No. 26A124, 2026 WL 2473573, at *1 (U.S. Aug. 24, 2026). The district court previously enjoined implementation of that aspect of the Executive Order with respect to the upcoming November 2026 election. On August 24, 2026, the Supreme Court stayed that injunction. *Id.*

On August 26, 2026, USPS published the Final Rule in the Federal Register. That same day, both the *LWVM* plaintiffs and the *California* plaintiffs sought to challenge the Rule. On August 27, the district court granted plaintiffs' request for a TRO, and the federal defendants appealed and sought a stay. While those stay motions remained pending, on September 4, 2026, the district court converted the TRO into a preliminary injunction, relying on substantially the same reasoning.

Like the TRO, the preliminary injunction permits States' voluntary participation in the Rule's envelope design review process and use of USPS's online portal but prohibits the government from verifying that ballot envelopes comply with the Rule's requirements before accepting them for mailing. Under the order, "[f]or elections occurring before or on November 3, 2026," the defendants "may not implement in

any way and may not take any further preparatory steps to implement" the enjoined provisions. Op. 48. The district court also denied the federal defendants' request for a stay pending appeal. Op. 46-47.

## ARGUMENT

A stay pending appeal is warranted because the government is likely to succeed on the merits, will face irreparable injury, and the equities support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### I. The Government Is Likely to Succeed on the Merits Because the Final Rule Is Lawful

The Final Rule is a lawful exercise of USPS's authority to regulate the mail. It imposes only modest requirements on the use of the mail and does not regulate state administration of elections. That reality wholly undermines the district court's order, which found summarily that USPS lacked statutory authority to issue the Rule and that the Rule is unconstitutional.

#### A. The Final Rule is authorized by statute.

**1.** Plaintiffs' claims that the Rule is contrary to statute are subject to narrowly circumscribed judicial review. Congress has generally exempted USPS from Administrative Procedure Act (APA) review. *See* 39 U.S.C. § 410(a). In light of this preclusion of review, plaintiffs must satisfy the ultra-vires review standards under *Leedom v. Kyne*, 358 U.S. 184, 188 (1958), to prevail on their statutory claims. *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305, 307 (D.C. Cir. 2014). To succeed on a

*Leedom* ultra vires claim—essentially a "Hail Mary pass"—a plaintiff must demonstrate that "an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *NRC v. Texas*, 605 US. 665, 681 (2025) (emphasis and quotation marks omitted). Finding that "an agency has arguably reached a conclusion which does not comport with the law" is not sufficient. *Id.* (quotation marks omitted).

The district court held that the *Leedom* standard is inapplicable unless Congress "has provided a reticulated judicial review scheme." Op. 28 n.32 (quoting *Board of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). That is incorrect. The *Leedom* standard applies whenever there is a *preclusion* of review. That includes not only implied preemption through a reticulated review scheme, but also, as here, when Congress has expressly precluded judicial review. *See* 39 U.S.C. § 410(a); *cf. MCorp*, 502 U.S. at 43.

Neither plaintiffs nor the district court identified any "specific" or "mandatory" statutory provision that the Rule violates. Instead, they "dress up a typical statutory-authority argument as an ultra vires claim." *NRC*, 605 U.S. at 682. That sort of routine "statutory argument falls well shy of a meritorious *Leedom v. Kyne* claim," *id.*, which alone is sufficient to demonstrate that plaintiffs are not likely to succeed on the merits.

**2.** In any event, the Rule is a proper exercise of USPS's regulatory authority. Congress authorized USPS "to adopt, amend, and repeal such rules and regulations,

not inconsistent with this title, as may be necessary in the execution of its functions under this title and such other functions as may be assigned to [USPS] under any provisions of law outside of this title." 39 U.S.C. § 401(2). Congress further granted USPS "all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers." *Id.* § 401(10). Those specific powers include the power "to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail." *Id.* § 404(a)(1).

The Supreme Court has stated that "under 39 U.S.C. § 401, the Postal Service is broadly empowered to adopt rules and regulations designed to" maintain an efficient system for collecting, sorting, and delivering mail nationwide. *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 123 (1981); *see Associated Third Class Mail Users v. USPS*, 600 F.2d 824, 826 n.5 (D.C. Cir. 1979) ("[USPS] is authorized under 39 U.S.C. § 401(2) (1976) to promulgate regulations to further the objectives of Title 39."). Under these authorities, USPS's general rulemaking powers include authority to impose reasonable requirements for envelope design and labeling and to require that mailers provide basic information regarding particularly sensitive items.

As the Rule explains, *see* 91 Fed. Reg. at 54,974, USPS has issued regulations governing particular types of mail pursuant to these authorities before—including where, as here, the type of mail in question is mailable and non-dangerous but sensitive and involves unique operational concerns. For example, cremated human

and animal remains must be transported through specific types of USPS-provided boxes and must be trackable via barcode. *See Cremated Remains Packaging Requirements*, 90 Fed. Reg. 9843 (Feb. 19, 2025) (explaining that these rules address "sensitive matter" and "will improve visibility and enhance handling methods throughout processing and transportation"). Similarly, replica explosives—which, although not dangerous, require special handling to prevent operational disruptions based on the misperception that they are actual explosives—must be mailed in certain ways, including in-person presentation to a retail counter and shipment via Registered Mail. *See Restricting the Mailing of Replica or Inert Explosives*, 75 Fed. Reg. 282, 283 (Jan. 5, 2010) (noting that "[t]his process will ensure that packages containing these items remain separate and easily identifiable during the mailing process").

This Rule functions similarly, and for similar reasons. Although ballot mail does not present the same concerns as cremated remains or replica explosives, it is sensitive mail that raises unique operational considerations. Timely delivery of ballot mail is especially important given specific state deadlines for receipt of ballots, *e.g. Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2171 (2026); *see* 91 Fed. Reg. at 54,974, and allowing ballots to be submitted by mail creates an opportunity for the mails themselves to be used to facilitate serious frauds that undermine public confidence in federal elections, *see* 91 Fed. Reg. at 54,969; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). The district court simply ignored these existing USPS policies even though they cannot be squared with the conclusion that USPS

lacks authority to adopt mandatory rules imposing processing conditions on sensitive mailable material that presents unique issues. USPS must have at least as much authority to prevent that sort of harm with respect to ballot mail as it does to ensure that mortal remains are not lost in the mail.

Nor is USPS legally obligated to turn a blind eye to the use of the mail to facilitate specific *types* of fraud. Consider, for example, a scenario in which retirement communities are repeatedly targeted for elder-abuse mail scams. There is no evident reason why USPS could not impose special design and registration rules for envelopes used to send solicitations to such locations. This Rule follows the same basic form, by acknowledging the indisputable reality that election-related mail is particularly sensitive, and that crimes relating to election mail are particularly important. 91 Fed. Reg. at 54,969. And so, "[w]hether or not voter fraud is common or uncommon, [USPS] has the legal authority to take the measures in this rule to facilitate enforcement of federal law[.]" *Id.*

**3.** The district court held that USPS lacked authority to issue the Rule because "Title 39 excludes any reference to elections." Op. 29. But the Rule does not regulate the form or content of the ballots themselves, the timeline for the transmission of ballots, voter eligibility, vote-by-mail eligibility, or anything similar. It regulates only how States must design and label the envelopes they send via U.S. mail (should they choose U.S. mail to send ballots), and requires States to provide information to USPS regarding those mailings. As the Rule itself makes clear, USPS "does not purport to

alter the eligibility of any individual to vote under state or federal law." 91 Fed. Reg. 54,991. Both before and after this Rule, USPS "does not have any legal responsibility for management of state voter rolls or the administration of federal elections within each State." *Id.* In other words, this is a regulation of the U.S. mail—not a regulation of elections.

It should be beyond dispute that USPS can exercise its general rulemaking authority to adopt election-specific mail-preparation rules. USPS has long employed ballot-mail envelope design elements to prioritize delivery of ballot mail. Kit 600 at 4, https://about.usps.com/kits/kit600.pdf. The Postal Operations Manual also provides that, even if a mailer does not affix the necessary postage, "absentee balloting materials must not be detained or treated as unpaid mail," and must instead "be promptly dispatched and delivered to the addressees." USPS, *Postal Operations Manual* § 171.3, https://perma.cc/HY9N-TJ6Q. Indeed, many of the plaintiff States previously sued to demand that USPS treat election mail differently by delivering it as First Class Mail regardless of the service paid for. *See Washington v. Trump*, 487 F. Supp. 3d 976, 980, 984 (E.D. Wash. 2020). Plaintiffs' co-counsel and co-plaintiffs have likewise advocated for and benefited from specific ballot-mail envelope designs and the prioritization of such mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1 (D.D.C. July 1, 2026). If USPS has *no* legal authority to make any rules specific to election-related mail—per plaintiffs' (and the district court's) theory—it is hard to understand how those longstanding efforts would be lawful.

In an apparent effort to distinguish such longstanding election-mail specific rules, the district court limited its injunction to "mandatory" enforcement of the Rule, stating that much of USPS's election-specific rules were "only non-binding guidance." Op. 29. There is no textual basis for that distinction in the relevant statutes—and such a distinction makes no sense. Congress does not typically grant agencies the authority to make rules, but only if they are toothless.

The district court erred in opining that the Rule is inconsistent with statutory provisions defining categories of "nonmailable" material. Op. 30. Even assuming that USPS is impliedly barred from using its general rulemaking power to create additional categories of "nonmailable" material beyond the categories mandated by Congress, the Rule's modest conditions on acceptance of ballot mailings do not render ballot mail nonmailable—just as the conditions placed on cremated remains or replica explosives do not render those items nonmailable. *See, e.g.*, 75 Fed. Reg. at 283. Instead, USPS's general rulemaking authority allows it to adopt these types of modest processing rules for mailable but sensitive materials.

The district court noted that some statutorily-defined nonmailable matter likewise imposes conditions on acceptance, *see* 39 U.S.C. § 3001(d), but that does not support a holding that *any* conditions for mailing materials establishes an impermissible nonmailability rule. Indeed, apart from USPS's general rulemaking powers, there does not appear to be any specific statutory authority for the mandatory requirement that mailpieces "must have the address of the intended recipient, visible

and legible, only on the side of the piece bearing postage," *Domestic Mail Manual* 602.1.2, https://pe.usps.com/text/dmm300/602.htm#1_0, yet this venerable requirement is obviously well within USPS's authority to adopt, and the fact that USPS would not deliver such mail does not violate the statutory rules governing nonmailable matter.

The foregoing points also demonstrate the inapplicability of the major-questions doctrine. Op. 28-29. USPS's authority to impose modest preparation requirements for particular types of sensitive mail that raise particular operational concerns, which is a core exercise of its power to operate the mails, lacks the sort of "economic and political significance" that triggers the doctrine, *Learning Res., Inc. v. Trump*, 607 U.S. 229, 246 (2026) (plurality op.), and is hardly some "unheralded power representing a transformative expansion [of USPS's] regulatory authority," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quotation marks omitted). To the contrary, it is a routine application of USPS's regulatory authority in keeping with past applications.

Finally, the district court's assertion (Op. 26) that the Rule conflicts with the provision of the Help America Vote Act providing that States must maintain "the single system for storing and managing the official list of registered voters throughout the State," 52 U.S.C. §§ 21083(a)(1)(A)(i), is nonsensical. The Rule does not alter the States' creation or maintenance of its centralized list of registered voters or create a

distinct system for that purpose. It requires only that States provide USPS with information on ballots that are sent through the mail.

### B. The Final Rule is consistent with the Constitution.

The district court's holding that the Rule "encroaches upon the States' and Congress's Election Clause powers," Op. 25, fares no better. As discussed, the Rule "leav[es] the administration of elections firmly in the hands of the [S]tates." 91 Fed. Reg. at 54,970. "Eligibility for mail-in and absentee voting will continue to be governed by state law; state and local election officials will still determine which individuals are eligible under these laws; and state and local election officials will determine whether completed ballots are eligible to be counted." *Id.* at 54,978. USPS "will not play any role in determining voter eligibility, maintaining voter rolls, or counting ballots." *Id.* The Rule is instead a modest exercise of USPS's own judgment about how "to faithfully execute federal law and also to advance [USPS's] operational interests[.]" *Id.* at 54,976.

The district court stated that the Rule nevertheless regulates elections because it applies only to election mail. Op. 27. But all parties agree that *Congress* can directly regulate the manner of elections, U.S. Const. art. I, § 4, cl. 1, as well as the U.S. mail, U.S. Const. art. I, § 8, cl. 7. Thus, if the Rule is authorized by Congress, then there cannot be an Election Clause (or Postal Clause) problem. By contrast, while States are entitled to regulate the manner of elections—and the Final Rule does nothing to displace that authority—they are not entitled to set their own rules for USPS's

handling of the mail. That authority belongs instead to Congress, U.S. Const. art. I, § 8, cl. 7, and USPS, 39 U.S.C. § 401.

In any event, the district court's constitutional-authority objection proves far too much. Again, USPS has long used election-specific rules and practices. *See supra* at 12-13. And these plaintiffs' co-counsel and co-plaintiffs have filed lawsuits arguing that USPS had not gone far *enough* in prioritizing election mail. *See NAACP v. USPS*, 2026 WL 1893762, at *1. But if *any* election-specific regulation of the U.S. mail violates the Constitution, those prioritization efforts would have been equally unconstitutional—an implausible result that illustrates the untenable nature of the district court's theory.

## II. The Remaining Factors Warrant A Stay

A stay pending appeal is also warranted because the balance of equities and the public interest disfavor enjoining USPS from implementing the Rule.

**1.** The district court's injunction imposes irreparable harm on the federal government. At least one State—North Carolina—has already begun mailing ballots for the November 3, 2026 election. Op. 16-17. The government understands that at least 17 more States will begin mailing their ballots in the next three weeks,[1] with three

[1] *See* Ala. Code §§ 17-11-5(a) and 17-11-12; Ark. Code Ann. § 7-5-407(a)(1) and (2); Fla. Stat. § 101.62(3)(b) ; Idaho Code § 34-1003(3); Ind. Code §§ 3-11-4-15 and 3-11-4-18(c); Md. Code Ann., Elec. Law § 9-306(c)(1); Mich. Const., Art. II, § 4(1)(h); Minn. Stat. § 203B.06(3)(a); Nev. Rev. Stat. 293.269911(5); N.J. Stat. Ann. § 19:63-9(a); 26 Okla. Stat. § 14-118(A)(2); S.D. Codified Laws §§ 12-19-1.2 and 12-19-2; Vt.

others shortly behind.[2] The district court's injunction prohibits defendants from "tak[ing] any further preparatory steps to implement" the Rule's verification procedures, Op. 48, which threatens USPS's ability to implement the Rule's beneficial practices for upcoming ballot mailings, even if the injunction is later stayed or vacated.

As the Supreme Court held just twelve days ago in staying the *California* plaintiffs' earlier injunction, the government suffers irreparable harm when an injunction "deal[s] 'a serious setback' to the Executive's 'goals'" and appellate review in the ordinary course "would come too late" for the upcoming election. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026); *see also id.* ("When a federal court 'improperly intrudes on a coordinate branch' in this way, interim relief is justified." (citation omitted)).

As noted above, several features of the Rule have long been recommended "to ensure timely processing and delivery" of ballot mail. 91 Fed. Reg. at 54,978. By making "these proven measures a consistent baseline for every jurisdiction that mails federal ballots," the Rule "clos[es] the patchwork that today inhibits mailpiece visibility and can make it more difficult to process and deliver ballot mail." *Id.* Additionally, the Rule's "data reporting and mail-preparation requirements" place

---

Stat. Ann. Tit. 17, § 2537a(a)(1); Va. Code Ann. §§ 24.2- 612 and 24.2-706(C); W. Va. Code § 3-3-5(e)(1); Wis. Stat. § 7.15.

[2] *See* Mo. Rev. Stat. §§ 115.281(1) and 115.287(1); Neb. Rev. Stat. § 32-808(1); N.D. Cent. Code §§ 16.1-07-04 and 16.1-07-08(1).

"law enforcement in a better position to identify any potential issues regarding compliance with federal law that may merit further investigation," *id.* at 54,985, and "strengthen public confidence" in voting by mail, *id.* at 54,986. USPS found the "visibility and law enforcement benefits" so significant that it saw "no compelling reason for any delay" in the Rule's effective date. *Id.* at 54,985. By prohibiting USPS from implementing the beneficial practices prescribed by the Rule for the upcoming election, the injunction inflicts irreparable harm on defendants.

**2.** The balance of equities also favors a stay. The district court found that plaintiffs will suffer irreparable harm based on the prospect that some States may be unable to comply with the Rule, resulting in disenfranchisement. Op. 32-45. But the States with the closest deadlines have not claimed that compliance is impossible, and reliance on States' bald assertions about difficulties they might face does not conclusively establish irreparable harm.

Indeed, in a public statement made just hours before the district court's TRO last week, the North Carolina State Board of Elections announced that the State had begun taking steps to comply with the Rule, and that it "is confident that the county boards of elections plan to send out absentee ballots to North Carolina voters who have requested them for this election, starting September 4, as required by state law, will happen flawlessly and smoothly." Jen Rice, *Facing time crunch, North Carolina takes first step to comply with new USPS mail voting rule while fighting it* (Aug. 27, 2026), https://perma.cc/SFB6-PAVD. And intervenor-defendants Alabama, Florida,

Indiana, Oklahoma, and South Dakota, all of which are scheduled to begin sending ballots before September 24, have never argued that it would be impossible to comply with the rule.

Nor have plaintiff States uniformly established that compliance with the Rule at this late date is "impossible." Op. 23. New Jersey, for example, asserted that it faces increased "practical and financial burden[s]" and could only speculate that "[i]f the system fails, New Jersey may be unable to mail ballots to voters at all." Dkt. 4-15 ¶ 24. Illinois, which focused its declaration on Cook County, a jurisdiction that *already* uses barcodes for its ballot mail, similarly cited only financial costs and diversion of resources from other tasks. *See* Dkt. 4-24 ¶¶ 37, 57, 59. These are ordinary costs of compliance with a lawful rule and the district court erred by relying on them as outweighing the irreparable harm the court's order works in barring USPS's lawful regulation of the mail. Moreover, the USPS has committed to "make available considerable educational and other support resources . . . to assist election officials with implementation and help facilitate timely compliance." 91 Fed. Reg. at 54,985; *see also id.* at 54,974 ("[A]mple resources are available to assist states with ballot mail envelope design, should such assistance be required."). USPS has further averred that the portal will be functional by next week. *See* Dkt. 150-1, at 2 (Monteith Decl. ¶3). And in any event, the "most critical" stay factors, *Nken*, 556 U.S. at 434—the merits and irreparable harm—favor the government. Thus, plaintiffs' asserted harms from

the Rule (even if credited) cannot be sufficient to defeat a stay of an improper injunction of a lawful rule.

**3.** Finally, a stay at minimum is warranted with respect to the injunction's extension beyond plaintiff States. The *California* plaintiffs alone cannot obtain universal relief, because those plaintiffs will suffer no cognizable injury from application of the Rule to ballots mailed by or to other States. And the *LWVM* plaintiffs do not have Article III standing. *Pagán v. Calderón*, 448 F.3d 16, 26 (1st Cir. 2006) (Article III standing is "plaintiff-specific"); *Trump v. CASA, Inc.*, 606 U.S. 831, 844, 861 (2026) (any injunction must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue.").

The district court held that the *LWVM* plaintiffs are likely to have standing because its members "are threatened with grave harm, namely disenfranchisement, if they do not receive a mail ballot." Op. 21. As already discussed, however, the Final Rule does not and should not prevent a single voter from voting by mail. The district court opined that this might not be the case if USPS does not timely approve States' ballot and return ballot envelopes or if State and local election officials found it impossible to comply with the Rule's requirements. Op. 23. But that "potential future" theory of voter disenfranchisement is based on a "speculative chain of possibilities" that may not come to pass. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Likewise, the district court erred in holding that the *LWVM* plaintiffs have standing because the alleged "chaos" caused by the Rule makes their goals for voter participation harder to achieve. Op. 22-23. To establish organizational standing, "[a] plaintiff must show far more than simply a setback to the organization's abstract social interests," "no matter how longstanding the interest and no matter how qualified the organization" or the strength of its "opposition to the government's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (quotation omitted). An "organization cannot manufacture its own standing" by merely "engaging in public advocacy and public education" regarding governmental action. *Id.*

## CONCLUSION

This Court should grant a stay pending appeal and administrative stay.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
ERIC D. MCARTHUR
*Deputy Assistant Attorney General*
BRAD HINSHELWOOD
*/s/ Laura E. Myron*
LAURA E. MYRON
JENNIFER L. UTRECHT
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

September 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,159 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are represented by registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Laura E. Myron*
LAURA E. MYRON

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants,<br><br>and<br><br>STATE OF MISSOURI, et al.,<br><br>Intervenor-Defendants. | * | Civil Action No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES POSTAL SERVICE, et al.,<br><br>Defendants,<br><br>and<br><br>STATE OF MISSOURI, et al.,<br><br>Intervenor-Defendants. | * | Civil Action No. 1:26-cv-13917-IT |

MEMORANDUM AND ORDER GRANTING PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

September 4, 2026

TALWANI, D.J.

Pending before the court are two motions for preliminary injunctive relief[1] joined for briefing pursuant to Federal Rule of Civil Procedure 42(a)(1).[2] For the reasons stated below, the court GRANTS a preliminary injunction prohibiting the United States Postal Service ("USPS") from implementing mandatory sections of its final rule, Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111) (the "Final Rule"), for the November 3, 2026 midterm elections.

## I. Background

### *A. Procedural Background*

The winding procedural history of this litigation is as follows.

1. The EO

This past spring, President Donald J. Trump issued Executive Order 14399, Ensuring Citizenship Verification and Integrity in Federal Elections, 91 Fed. Reg. 17125 (Mar. 31, 2026) (the "EO"). The EO asserted "an unavoidable duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." Exec. Order 14399 § 1.

The EO gave various directives, including directing the Postmaster General of the USPS to initiate a proposed rulemaking, with a publication date for a final rule of no later than July 29, 2026. Id. § 3(d). The EO required USPS's proposed rule to (1) include requirements regarding

[1] See Mot. for a TRO, Emergency Stay, and Expedited Prelim. Inj. and Stay, California v. U.S. Postal Serv. ("California II"), No. 1:26-cv-13917 [Doc. No. 3]; Emergency Mot. for a TRO and Prelim. Inj., League of Women Voters of Massachusetts v. Trump ("LWVM"), No. 1:26-cv-11549 [Doc. No. 206].

[2] See Order, LWVM, No. 1:26-cv-11549 [Doc. No. 212]. Where documents have been filed on the dockets of both cases, the court will cite to the docket in LWVM, No. 1:26-cv-11549, unless otherwise specified.

election mail design; (2) specify that the USPS, after receiving State-furnished lists of voters approved to vote by mail, "shall provide each State with a list of individuals . . . who are enrolled with the USPS" pursuant to a process specified in the rule; and (3) state that the USPS shall not transmit the ballot of any voter unless the individual has been so "enrolled." Id.

2. Initial Proceedings in Litigation Challenging the EO in this District

On April 2, 2026, Plaintiff Organizations[3] initiated this litigation against President Trump, the agencies principally charged with implementing the EO, and those agencies' officers.[4] Compl. [Doc. No. 1]. On April 3, 2026, twenty-three States and the District of Columbia ("Plaintiff States" [5]) challenged the same EO, in a related case assigned to this session.[6] See California v. Trump ("California I"), No. 1:26-cv-11581 (D. Mass. Apr. 3, 2026). Subsequently, the court allowed permissive intervention by Intervenor-Defendants[7] in each case,

[3] Plaintiff Organizations are the League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc. Compl. [Doc. No. 1].

[4] In addition to President Trump, Plaintiff Organizations sued the USPS, Postmaster General, Deputy Postmaster General, members of the USPS Board of Governors and the Board's Chairwoman (collectively, the "USPS Defendants"); the Department of Homeland Security and its Secretary; U.S. Citizenship and Immigration Services and its Director; and the Social Security Administration and its Commissioner.

[5] Plaintiff States in that action were Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania. Am. Compl., California I, No. 1:26-cv-11581 [Doc. No. 65].

[6] Defendants in that action were the same governmental officials sued by Plaintiff Organizations, and, in addition, the Department of Justice and the Attorney General; and the Department of Commerce and its Secretary. Am. Compl. California I, No. 1:26-cv-11581 [Doc. No. 65].

[7] Intervenor-Defendants are Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas. Elec. Order [Doc. No. 106]; Elec. Order, California I, No. 1:26-cv-11581 [Doc. No. 179].

pursuant to Federal Rule of Civil Procedure 24(b). The court joined the two cases pursuant to Federal Rule of Civil Procedure 42(a) for the limited purpose of a joint briefing and hearing schedule on certain motions. See Order [Doc. No. 57].

3. USPS's Notice of Proposed Rulemaking

On June 2, 2026, the USPS issued its proposed rule. See USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections ("NPRM"), 91 Fed. Reg. 32915 (June 2, 2026).

4. Further Proceedings in this Court

a. Joint Proceedings

On June 18, 2026, the court granted in part Defendants' and Intervenor-Defendants' motions to dismiss in both cases, see Intervenors' Mot. to Dismiss [Doc. No. 124]; Defs.' Mot. to Dismiss [Doc. No. 126], and dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1), on prudential ripeness grounds, Plaintiff Organizations' and Plaintiff States' claims with regard to elections occurring after November 3, 2026. Mem. & Order 17 [Doc. No. 166]. The court denied dismissal in both cases on prudential ripeness grounds with regard to elections occurring before or on November 3, 2026. Id.

b. Proceedings in California I

On June 25, 2026, in California I, the court denied the remainder of Defendants' and Intervenor-Defendants' motions to dismiss the States' complaint and granted summary judgment in favor of the Plaintiff States. See California I, __ F. Supp. 3d __, No. 1:26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026). The court entered final judgment on July 7, 2026, enjoining Defendants (other than President Trump) from implementing Sections 2 and 3 of the EO, but only as to the twenty-three plaintiff States and the District of Columbia and only with respect to

elections occurring before or on November 3, 2026. Final Judgment, California I, No. 1:26-cv-11581 (D. Mass. July 7, 2026) [Doc. No. 207].

c. Proceedings in LWVM

On July 13, 2026, in LWVM, the court denied without prejudice Plaintiff Organizations' first preliminary injunction motion, finding that another court's nationwide preliminary injunction of Section 3 of the EO obviated Plaintiff Organizations' alleged irreparable harm. Mem. & Order 2 [Doc. No. 167].[8] On July 20, 2026, after that preliminary injunction was stayed,[9] Plaintiff Organizations renewed their preliminary injunction motion, seeking relief only against the USPS Defendants. Pls.' Renewed Mot. for Prelim. Inj. [Doc. No. 170].

On July 22, 2026, the court granted Defendants' and Intervenor-Defendants' motions to dismiss in part, dismissing Count VI of Plaintiff Organizations' Complaint [Doc. No. 1] without prejudice where Plaintiff Organizations had failed to allege any final agency action sufficient for a claim under the Administrative Procedure Act ("APA"). Mem. & Order 20–21 [Doc. No. 175]. The court denied the remainder of the motions to dismiss, finding that Plaintiff Organizations had both organizational and associational standing to challenge the EO as to elections occurring

---

[8] In NAACP v. USPS, a plaintiff advocacy organization moved to enforce the USPS's compliance with a settlement agreement arising from a lawsuit which had alleged claims under the Administrative Procedure Act related to the 2020 federal election. See No. 20-cv-2295, 2026 WL 1893762 (D.D.C. July 1, 2026), appeal pending, NAACP v. USPS, No. 26-5257 (D.C. Cir. July 9, 2026). The D.C. district court found that the proposed rule would violate the parties' settlement agreement. Id. at *4. At the time of this court's denial of the Plaintiff Organizations' first motion for a preliminary injunction, the D.C. district court's order enjoining the USPS from implementing its proposed rule pursuant to Section 3 of the EO, see id. at *7, was in effect.

[9] In a one-paragraph order, the D.C. Circuit stayed the D.C. district court's order, determining that the appellants had "made a strong showing" that they would "likely succeed on their arguments" that the proposed rule was not ripe for review where no final rule had yet issued and that the EO likely would not violate the settlement agreement. See NAACP v. USPS, No. 26-5257, 2026 WL 2168004 (D.C. Cir. July 17, 2026). The court also found that the government would experience irreparable harm from an order that prohibited the USPS from promulgating a final rule. Id. The panel did not elaborate further as to its reasoning. See id.

on or before November 3, 2026, and that Plaintiffs had plausibly alleged constitutional claims and a claim under the Voting Rights Act. Id. at 2, 21.

5. Proceedings in the First Circuit in California I

On July 25, 2026, the First Circuit denied the federal Defendants and Intervenor-Defendants request for a stay pending appeal, finding Article III standing where the EO threatened the Plaintiff States with criminal prosecution, pecuniary injury, and harm to their sovereign interests. See California v. Trump, 183 F.4th 52, 65–71 (1st Cir. 2026). The First Circuit noted both that the federal Defendants had declined to defend the legality of the EO, id. at 63, and that "[t]he EO directs unprecedented levels of involvement by federal officials in how states administer elections." Id. at 70.

6. Further Proceedings in LWVM

On August 11, 2026, the court granted a nationwide preliminary injunction, enjoining the USPS Defendants

> from implementing, giving effect to, or enforcing Section 3 of [the EO], with respect to the November 3, 2026 or any earlier federal election, including refusing to transmit mail-in or absentee ballots; or otherwise initiating or completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)(v) or (d) of the EO for the November 3, 2026 or any earlier election.

Mem. & Order 27 [Doc. No. 183].

7. USPS's Final Rule

Despite this court's injunction, on Friday, August 21, 2026, at or around 9:00 p.m., the USPS issued a final rule implementing Section 3 of the Executive Order. See USPS, Ballot Mail for Federal Elections (Aug. 21, 2026) (accessible at https://public-

inspection.federalregister.gov/2026-17238.pdf).[10] The USPS reported that it had received over 200,000 comments from citizens; postal unions; federal, state, local, and tribal officials; election officials; voting rights organizations; and other issue-based and political advocacy groups. Fed. Reg. at 54966–82. In answering comments, the agency responded to issues related to the USPS's legal authority to issue the rule, the election integrity policy justification, various constitutional and statutory concerns, and operation concerns. Id. "[T]o help achieve the goals articulated by the [EO]," id. at 54976, the Final Rule imposes conditions States must meet in order to use the USPS to deliver mail ballots, id. at 54990–92.

The Final Rule mandates that: (1) ballot envelopes and return envelopes must comply with certain ballot envelope design requirements, 91 Fed. Reg. at 54990–91 (DMM 705.24.3.1, 705.24.3.2); (2) State or local election officials must submit their ballot envelope and return envelope designs to the USPS for approval, id.; and (3) after obtaining approval of the ballot envelope and return envelope designs, State or local election officials must input each voter's information into a USPS-run electronic portal, id. at 54991 (DMM 705.24.4.2).

The Final Rule precludes election officials from uploading voter information until the USPS approves the ballot envelopes and return ballot envelopes. Id. at 54991 (DMM 705.24.4.2(f)). And where a State or local election official does not obtain envelope and return envelope design approval, or does not upload voter information, or does not include unique

[10] The final rule was published in the Federal Register on August 26, 2026, but has been effective as of August 21, 2026. USPS, Ballot Mail for Federal Elections, 91 Fed. Reg. 54966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111). The final rule noted that "[g]iven injunctions currently in place in State of California v. Trump, No. 26-cv-11581 (D. Mass. June 25, 2026), and League of Women Voters of Massachusetts v. Trump, No. 26-cv-11549 (D. Mass. Aug. 11, 2026), the Postal Service will not take actions to implement the rule specifically for the 2026 election unless and until the government obtains relief from those injunctions." Id. at 54966.

intelligent mail barcodes on ballot envelopes, the USPS will not mail ballots to voters. Id. at 54991 (DMM 705.24.5.1, 705.24.5.2, 705.24.5.3).

Accordingly, effective August 21, 2026, for elections including the November 3, 2026 midterms, the USPS conditions States' use of the postal service on the USPS's sign-off on ballot envelopes and return envelopes and on State and local election officials then uploading and certifying voter information through the USPS portal. Id. at 54985 (the Final Rule "requires . . . that [S]tates that choose to use the U.S. mail as part of their elections adhere to certain standard mailpiece design and data reporting standards when sending Federal Ballot Mail.") (emphases added).

8. The Supreme Court Order in California I and the Lifting of the Injunction in LWVM

After their request for a stay of this court's injunction in California I was denied by the First Circuit, the federal Defendants and Intervenor-States promptly filed emergency applications for a stay with the United States Supreme Court. See Trump v. California, No. 26A124 (U.S. July 27, 2026); Alabama v. California, No. 26A139 (U.S. July 29, 2026). Before the Supreme Court, Defendants and Intervenor-Defendants again declined to contest the merits of this court's final judgment finding the EO unconstitutional. See Appl., Trump v. California, No. 26A124 (U.S. July 27, 2026); Appl., Alabama v. California, No. 26A139 (U.S. July 29, 2026).

On Monday afternoon, August 24, 2026, the Supreme Court granted the government's emergency application for a stay of the injunction in California I. See Trump v. California, No. 26A124, 609 U.S. __, 2026 WL 2473573 (Aug. 24, 2026). The Supreme Court found that "[t]wo related doctrines of justiciability block[ed] the States' suit," standing and ripeness. Trump, 609 U.S. at __, 2026 WL 2473573, at *2.

Regarding Section 3 of the EO, the Supreme Court held that the plaintiff States' asserted pocketbook injury was too speculative to confer standing because the USPS's publication of the final rule was hypothetical when the States filed their amended complaint. Id. at *2, *4 ("The States cannot preemptively concretize their injury by expending funds before the Postal Service finalizes a rule.").

The Supreme Court found that this court erred by "speculat[ing]" that the USPS would: (1) propose a rule; (2) weigh the comments; and (3) issue a final rule consistent with the EO's directives. Id. at *4; see id. ("Federal courts review final rules, not proposed rules—and certainly not antecedent internal directives to propose a rule."). The Supreme Court's order made no reference to the USPS's publication of the final rule that prior Friday night.[11]

Finding this court's review of the merits premature, the Supreme Court stayed the injunction in California I. Id. at *5. The Supreme Court specified, however, that the disposition of the government's emergency application "does not mean that any measure taken by the Government to implement the Order will necessarily be lawful." Id.

In light of the decision in Trump v. California, No. 26A124, 609 U.S. __, 2026 WL 2473573 (Aug. 24, 2026), this court determined that the LWVM case suffered from the same standing defects that the Court had identified and dissolved the nationwide preliminary injunction ordered in LWVM. Mem. & Order 2, 9 [Doc. No. 204].

[11] Instead, assuming that USPS had complied with this court's injunction, the Supreme Court found a likelihood of irreparable harm to the government where the injunction "prevents the Postal Service from so much as initiating a rulemaking that could yield a rule applicable to these States." Id. at *4 (emphasis added).

9. New and Supplemented Actions Before this Court

Plaintiff States[12] promptly challenged the Final Rule in a new action against the USPS Defendants, and Plaintiff Organizations promptly supplemented their complaint to add allegations regarding the Final Rule. Both moved for preliminary relief as to the USPS Defendants. The court joined the motions pursuant to Federal Rule of Civil Procedure 42(a)(1) and set a briefing and hearing schedule. Order [Doc. No. 212]. On August 27, 2026, the court granted a temporary restraining order ("TRO"), enjoining USPS from implementing mandatory sections of the Final Rule for fourteen days. Mem. & Order 10–11 [Doc. No. 218]. On September 3, 2026, the court held a hearing on the pending motions.

*B. Federal Election Law*

1. Constitutional Framework

a. The Role of States and Congress as to the Time, Place, and Manner of Federal Elections

The Elections Clause of the Constitution provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators.

U.S. CONST. art. I, § 4, cl. 1. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes[.]" Smiley v. Holm, 285 U.S. 355, 366 (1932). "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the

[12] Hawai'i joined Plaintiff States. Pl. States' Compl., California II, No. 1:26-cv-13917 [Doc. No. 1].

mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 9 (2013) (quoting Foster v. Love, 522 U.S. 67, 69 (1997)). "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's preemptive intent. . . . Unlike the States' historic police powers, the States' role in regulating congressional elections . . . has always existed subject to the express qualification that it terminates according to federal law." Id. at 14–15 (citation modified).

Accordingly, as to the time, place, and manner of federal elections, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." Foster, 522 U.S. at 69 (quoting U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 832–33 (1995)).[13]

[13] In contrast to time, place, and manner rules where Congress may override state regulations, the U.S. Constitution empowers the States alone to determine eligibility requirements imposed on adult United States citizens in federal elections. See U.S. CONST. art. I, § 2, cl. 1 (Members of the U.S. House of Representatives must be elected by voters who "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."); U.S. CONST. amend. XVII (voters for U.S. Senators "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."). Therefore, because the States determine who is eligible to vote for their state legislators, the Constitution indirectly grants the States authority to determine who is eligible to vote for federal legislators.

The President is elected by vote of the Electoral College. See U.S. CONST. amend. XII. The Electors Clause empowers each State to appoint electors to the Electoral College "in such Manner as the Legislature thereof may direct[.]" U.S. Const. art. II, § 1, cl. 2. The States require that their electors be appointed by popular vote of qualified voters. See Chiafalo v. Washington, 591 U.S. 578, 584–85 (2020). Accordingly, the States alone determine voter-eligibility requirements, subject only to the outer limits of the Constitution. See, e.g., U.S. CONST. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged . . . on account of sex."); U.S. CONST. amend. XXVI ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged . . . on account of age.").

b. President's Limited Role in Federal Elections

The Constitution does not grant the President any specific powers over elections.[14] Broadly, the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed[.]" U.S. CONST. art. II, §§ 1, 3. The President "plays no direct role in the process" of appointing electors, "nor does he have authority to control the state officials who do." Trump v. United States, 603 U.S. 593, 627 (2024). As the Supreme Court has observed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." Medellín v. Texas, 552 U.S. 491, 526–27 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).

2. Statutory Landscape

Pursuant to its Elections Clause power, see U.S. CONST. art. I, § 4, cl. 1, Congress has enacted several laws regulating voting and elections. For example, the Voting Rights Act, Pub. L. No. 89-110, 79 Stat. 437 (1965) (codified at 52 U.S.C. § 10101), prohibits discriminatory voting or election practices. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Pub. L. No. 99-410, 100 Stat. 924 (1986) (codified at 52 U.S.C. §§ 20301–11) requires States (as well as U.S. territories and the District of Columbia) to permit otherwise-qualified voters residing or stationed overseas to vote in federal elections in the last place they were domiciled prior to leaving the United States. 52 U.S.C. §§ 20302, 20310. UOCAVA guarantees military and overseas voters the right "to use absentee registration procedures and to vote by absentee ballot

[14] Regarding the allocation of election-related authority, the Framers explained: "[T]here were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former." THE FEDERALIST NO. 59 (Alexander Hamilton). Notably, the Framers excluded the Executive Branch from any allocation formulation.

in general, special, primary, and runoff elections for Federal office[.]" 52 U.S.C. § 20302(a)(1); see id. § 20302(a)(8)(A) (requiring States to transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots).

The National Voter Registration Act of 1993 (the "NVRA") sets forth certain voter registration requirements with respect to elections for federal office. 52 U.S.C. §§ 20501–20511.[15] Section 5 of the NVRA requires that States offer voter registration opportunities at state motor vehicle agencies. Id. § 20504. Section 6 of the NVRA requires that States offer voter registration opportunities by mail-in application and limits registration to using a prescribed federal form. Id. § 20505.

The Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, was passed after the 2000 Presidential election and "aimed 'to alleviate a significant problem voters experience'—eligible voters being turned away at the polls because their names were missing from voter registration lists." United States v. Benson, 179 F.4th 470, 476 (6th Cir. 2026) (quoting Sandusky Cnty. Democratic Party v. Blackwell, 387 F.3d 565, 569 (6th Cir. 2004) (per curiam)). HAVA requires states to maintain an electronic statewide voter registration list.[16] 52

[15] Legislation has been introduced in earlier sessions and in the current session of Congress to amend the NVRA to require individuals to provide documentary proof of citizenship when registering to vote, see Safeguard American Voter Eligibility (SAVE) Act, H.R. 8281, 118th Cong. (2024); Safeguard American Voter Eligibility (SAVE) Act, H.R. 22, 119th Cong. (2025), but has not been enacted into law.

[16] In 2025, officials in the Department of Justice's Civil Rights Division began sending letters to the Secretaries of various States, requesting access to State's electronic voter registration lists, and the federal government has sued the Secretaries of States who have denied access. The United States' lawsuits have been consistently dismissed and the government's requests held by courts to be facially deficient. See, e.g., Benson, 179 F.4th 470; United States v. DeMarinis, No. SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026), appeal filed, No. 26-1878 (4th Cir. July 13, 2026); United States v. Wis. Elections Comm'n, 833 F. Supp. 3d 949 (W.D. Wis. 2026); United States v. Bellows, __F. Supp. 3d ___, No. 1:25-cv-00468-LEW, 2026 WL 1430481 (D.

U.S.C. § 21083 (requiring "a single . . . official . . . interactive computerized statewide voter registration list" for each state that is "defined, maintained, and administered at the State level"). HAVA set certain minimum voting standards for the States to follow but provided that States may "establish[] election technology and administration requirements that are more strict than the requirements established under [HAVA][,]" provided that any stricter requirements are "not inconsistent" with HAVA or other federal voting laws. Id. §§ 21081, 21084. Finally, HAVA established an independent federal agency, the Election Assistance Commission, to develop and maintain the federal voting registration form. Id. § 20921.

*C. State Election Law*

States and their localities administer elections for federal office. U.S. CONST. art. I, § 4, cl. 1. To this end, States and their localities register voters, maintain and update voter rolls, issue ballots to registered voters, tabulate votes, and certify results in all elections for federal office.[17]

States have permitted absentee ballots and voting by mail since the Civil War. See Watson v. Republican Nat'l Comm'n, 146 S. Ct. 2165, 2175 (2026). The current state law landscape reflects significant variety. Eight States and the District of Columbia allow all elections to be conducted entirely by mail. See Cal. Elec. Code § 3000.5; Colo. Rev. Stat. § 1-5-401; D.C. Code § 1–1001.05; Haw. Rev. Stat. § 11-101; Nev. Rev. Stat. § 293.269911; Or. Rev. Stat. § 254.465; Utah Code § 20A-3a-202; Vt. Stat. tit. 17, § 2537a; Wash. Rev. Code § 29A.40.010.

---

Me. May 21, 2026), appeal filed, No. 26-1676 (1st Cir. June 15, 2026); United States v. Fontes, 832 F. Supp. 3d 944 (D. Ariz. 2026); United States v. Amore, 831 F. Supp. 3d 149 (D.R.I. 2026), appeal filed, No. 26-1665 (1st Cir. June 9, 2026); United States v. Galvin, 830 F. Supp. 3d 122 (D. Mass. 2026); United States v. Oregon, 828 F. Supp. 3d 1092 (D. Or. 2026), appeal filed, No. 26-1231 (9th Cir. Mar. 3, 2026); United States v. Weber, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

[17] See, e.g., Southard Decl. ¶ 4, California II, No. 1:26-cv-13917 [Doc. No. 4-1] (California).

Two States permit counties to opt into conducting elections by mail and allow all eligible citizens to vote by mail. See Neb. Rev. Stat. §§ 32-908, 32-952-63; N.D. Cent. Code §§ 16.1-11.1-01, 16.1-07-01.

Twenty-seven States allow any citizen to request a mail ballot without asserting a need or "excuse" to vote by mail (often referred to as no-excuse absentee voting). See Alaska Stat. § 15.20.010; Ariz. Rev. Stat. § 16-541; Conn. Gen. Stat. § 9-135; Fla. Stat. § 101.62; Ga. Code § 21-2-380; Idaho Code § 34-1001; 10 Ill. Comp. Stat. § 5/19-1; Iowa Code § 53.1; Kan. Stat. § 25-1119(a); Me. Rev. Stat. tit. 21-A § 751; Md. Elec. Law § 9-304; Mass. Gen. Laws. ch. 54 § 25B; Mich. Comp. Laws § 168.759; Minn. Stat. § 203B.02; Mont. Code § 13-13-201; N.J. Rev. Stat. § 19:63-3; N.M. Stat. § 1-6-3; N.Y. Elec. Law § 8-700; N.C. Gen. Stat. § 163-226; Ohio Rev. Code § 3509.02; Okla. Stat. tit. 26, § 14-105; Or. Rev. Stat. § 254.465; 25 Pa. Stat. § 3150.11; R.I. Gen. Laws § 17-20-2; S.D. Codified Laws § 12-19-1; Va. Code § 24.2-700; Wis. Stat. § 6.86 (1)(ac); Wyo. Stat. § 22-9-102.

Thirteen States require that citizens provide a reason as to why they need to vote by mail, with different States deeming different "excuses" justifiable. See Ala. Code § 17-11-3; Ark. Code § 7-5-402; Del. Code tit. 15, § 5502; Ind. Code § 3-11-10-24; Ky. Rev. Stat. §§ 117.077, 117.085(1)(a),; La. Stat. § 18:1303; Miss. Code § 23-15-715; Mo. Rev. Stat. § 115.277; N.H. Rev. Stat. § 657:1; S.C. Code § 7-15-320; Tenn. Code § 2-6-201; Tex. Elec. Code § 82.001 et seq.; W. Va. Code § 3-3-1. In all States, absence, illness, and disability are permitted "excuses" for which a citizen may request a mail ballot.

The fifty States and the District of Columbia have different rules as to when citizens need to request mail ballots. For example, Florida citizens must apply for absentee status by October 22, 2026, for the midterms, Fla. Stat. § 101.62(3)(c), while Connecticut citizens may request

their mail ballots the day before Election Day, or November 3, for this year's midterm election, Conn. Gen. Stat. § 9-140. In accordance with these different request periods, the States differ as to when election officials must begin sending mail ballots. For example, North Carolina statutorily requires its 100 county boards to mail ballots to requesting eligible voters 60 days before the election, September 4, 2026, with respect to the November midterms. N.C. Gen. Stat. § 163-227.10(a).

Further, jurisdictions vary significantly as to the unique needs posed by their respective electorates. For example, "Nevada is a very transitory state," where "approximately 15% of voters update their mailing or residential address at least once every two years," resulting in significant registration maintenance efforts by election officials.[18] In Arizona, voters are often a twenty- or thirty-mile drive from their assigned polling location.[19]

States also differ with respect to the level of election administration centralization. In some, the bulk of the work is completed by local county officials, with the Secretary of State's office providing general oversight and support.[20] In others, the State plays more of a central role.[21]

[18] Wlaschin Decl. ¶ 22, California II, No. 1:26-cv-13917 [Doc. No. 4-3].

[19] Fontes Decl. ¶ 27, California II, No. 1:26-cv-13917 [Doc. No. 4-5] ("This problem is particularly acute on the large swaths of tribal land within Arizona where roads are underdeveloped or nonexistent, including on the vast Navajo Nation and the Havasupai Reservation at the bottom of the Grand Canyon.").

[20] Hilby Decl. ¶ 5, California II, No. 1:26-cv-13917 [Doc. No. 4-26] ("Wisconsin has a uniquely decentralized election system in which most election administration occurs at the local level. Wisconsin has approximately 1,850 municipalities, each served by a municipal clerk responsible for administering elections.").

[21] Rock Decl. ¶¶ 11–12, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (stating that the Rhode Island Secretary of State's Election Division responsible for designing, ordering, and mailing ballots).

*D. The Postal Service*

The Constitution explicitly empowers Congress to establish an entity to provide and regulate postal services. U.S. CONST., art. I, § 8 ("The Congress shall have Power . . . To establish Post Offices and post Roads[.]"). Since its establishment, the national postal service has been reorganized or restructured several times. See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 120–26 (1981).

The Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. § 101 et seq., was directed in part toward reducing political influences on its operations. Postal Serv., 453 U.S. at 122–26. The PRA removed the postal service from the Cabinet to make it "an independent establishment of the executive branch of the Government of the United States[.]" 39 U.S.C. § 201. An eleven-member Board of Governors superintends the USPS. Id. § 202. With the advice and consent of the Senate, the President appoints nine governors who may only be removed for cause. Id. § 202(a)(1). The nine governors appoint the Postmaster General, who also serves as the chief executive officer of the USPS. Id. §§ 202–03. The nine Governors and the Postmaster General appoint the Deputy Postmaster General. Id. § 202(d).

Congress also established the Postal Rate Commission, now called the Postal Regulatory Commission ("PRC"). Id. § 3601 (repealed 2006). The USPS must submit any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" to the PRC for an advisory opinion. Id. § 3661(b). Upon receiving a proposal from the USPS, the PRC has 90 days to issue its advisory opinion. Id. § 3662; 39 C.F.R. § 3020.102(a). The PRC may, at its discretion, evaluate any "alternatives or related issues of significant importance" that may have been raised during the course of its proceedings. 39 C.F.R. § 3020.102(b).

The PRA also provides that "any interested person . . . who believes the Postal Service is not operating in conformance with the requirements of [specified sections[22]], or [Chapter 36 Postal Rates, Classes, and Services] (or regulations promulgated under any of those provisions) may lodge a complaint" with the PRC in the form and manner it prescribes. 39 U.S.C. § 3662(a) (emphasis added). The Commission must act on such a complaint within 90 days by initiating proceedings or dismissing the complaint. Id. § 3662(b).

If the PRC "finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance[.]" Id. § 3662(c). A party, including the USPS, adversely affected or aggrieved by a final order or decision of the PRC, may then seek appellate review directly in the D.C. Circuit, which applies the standards laid out in the APA. Id. § 3663 (citing 5 U.S.C. § 706); see Klein v. U.S. Postal Serv., __ F.4th __, No. 25-3965, 2026 WL 2277051, at **1, 5–6 (6th Cir. Aug. 7, 2026) (outlining history of the PRC and holding that a class-of-one discrimination claim must be channeled to the PRC for review pursuant to 39 U.S.C. § 3662(a)).

The USPS has issued several non-binding pieces of subregulatory guidance regarding election mail. In that guidance, the USPS has recommended, but not required, both the use of the official "election mail logo" and the use of various forms of tracking technology (including

[22] 39 U.S.C. § 101(d) requires postal rates to be established to apportion costs "on a fair and equitable basis." 39 U.S.C. § 401(2) concerns USPS's powers to adopt rules and regulations. 39 U.S.C. § 403(c) prohibits "undue or unreasonable discrimination among users of the mails[.]" 39 U.S.C. § 404a limits the Postal Service's adoption of rules precluding competition or compelling the disclosure of intellectual property. 39 U.S.C. § 601 establishes a method by which a letter may be lawfully carried out of the mails.

Serialized Intelligent Mail barcodes[23] and specific three-digit Service Type Identifiers[24]) on all election mail. See USPS, Publication 631: Official Election Mail — Graphic Guidelines and Logos (Feb. 2026) (accessible at https://about.usps.com/publications/pub631.pdf); USPS, New IMb Political Mail Service Type IDs For Letters & Flats Effective July 27, 2020 (Apr. 17, 2020) (accessible at https://postalpro.usps.com/IMb_PoliticalMail_SvcTypeIDs_July2020). Additionally, the USPS recommends that election officials consult with certain postal employees to ensure that election envelopes are compatible with automated sorting equipment. See USPS, 2026–2027 Official Election Mail Guide (Kit 600) (Feb. 2026) (accessible at https://about.usps.com/kits/kit600.pdf).

In enacting the PRA, Congress delegated many express powers to the USPS, including exercising the right of eminent domain, promulgating postal regulations, entering international postal agreements subject to the supervision of the Secretary of State, contracting, acquiring property, and settling claims. 39 U.S.C. §§ 401, 407. The PRA does not delegate to the USPS any specific authority regarding treatment of election mail. And under the PRA, the USPS retains the obligation to provide universal service to all parts of the country. Id. §§ 101, 403.

---

[23] According to the USPS Domestic Mail Manual ("DMM"):

> An Intelligent Mail barcode is the USPS-developed barcode that mailers use to encode routing and tracking information on mail that can be read by automated mail processing equipment to sort mail and to provide tracking information to the mailers. An Intelligent Mail barcode consists of 65 vertical bars, each representing one of four possible states: full bar, ascender, tracker, and descender. These 65 bars encode a string of 31 digits, divided into two parts: a 20-digit tracking code and an 11-digit routing code (when required). The 11-digit routing code may contain a ZIP Code, a ZIP+4 code, or a delivery point code[.]

DMM 204.1.2.1.

[24] A Service Type Identifier is a three-digit numeric code used within the Intelligent Mail Barcode on a mailpiece that identifies the address correction or other electronic services desired. USPS, Service Type Identifier (STID) Table (Jan. 21, 2024) (accessible at https://postalpro.usps.com/service-type-identifiers/stidtable).

## II. Jurisdiction

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 6–7 (1st Cir. 2018) (citation modified). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." Ramirez, 594 U.S. at 423 (citation omitted).

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." Id. (citation omitted).

### *A. Standing of Plaintiff States*

The Final Rule imposes obligations on Plaintiff States who seek to use the USPS to mail ballots to their citizens. Neither Defendants nor Intervenor-Defendants challenge the standing of the Plaintiff States. Defs.' Opp'n 6 n.4 [Doc. No. 235]; see Intervenors' Opp'n 5-7 [Doc. No. 234].

### *B. Standing of Plaintiff Organizations*

Both Defendants and Intervenor-Defendants dispute that Plaintiff Organizations have suffered an injury in fact sufficient to confer Article III standing. Intervenors' Opp'n 5–7 [Doc. No. 234]; Defs.' Opp'n 6–8 [Doc. No. 235].

1. Injury to Members

Plaintiff Organizations' members have individual standing. See Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). Plaintiff Organizations' members, residing in all fifty States and the District of Columbia, "need to vote by mail because of physical disabilities, mobility impairments or other health issues, limited English proficiency, residence in rural areas, service as poll workers on election day, or [studying as] college students away from their resident home." Pl. Orgs.' Mem. 13 [Doc. No. 207].[25] Members are threatened with grave harm, namely disenfranchisement, if they do not receive a mail ballot from their local election official. See infra Section III.C. This threat, moreover, is imminent. See id.

2. Injury to Organizations

Plaintiff Organizations are being injured by the Final Rule's tight timeframe. With the midterms now two months away, the Final Rule is impeding Plaintiff Organizations' core

[25] See Third Stewart Decl. ¶ 11 [Doc. No. 208-1] ("LWV's members include registered voters who are eligible to vote by mail in their states, have voted by mail in the past, and plan to vote by mail in the future. This includes members who are older than 65, have health concerns or disabilities that make it difficult to vote in person, and other reasons that require them to vote by mail."); Third Canavan Decl. ¶ 59 [Doc. No. 208-4] ("I am personally aware of one LWVMA member who is 93 years old, has very limited mobility, cannot stand for any period of time, and has limited hearing. She had voted by mail for the last few election cycles because of her physical limitations, and she is planning to vote by mail in this year's federal elections. She can safely drive only to locations she is very familiar with and has driven to before. She is not familiar with her polling locations and does not believe she would be able to drive to them. Given the challenges with her health and transportation, there is a substantial risk that she would not be able to vote in-person and, as such, would be disfranchised if vote-by-mail is not available to her."); Third Washington Decl. ¶ 64 [Doc. No. 208-5] (Delta Sigma Theta members "rely on mail voting due to being away from where they are registered to vote on Election Day because of school, work, military, or other obligations, physical disabilities, health issues, and mobility challenges, among other reasons like living in rural areas where transportation is limited and difficult to access."); Fourth Stewart Decl. ¶¶ 9–10 [Doc. No. 251-1] (Given Harris County, Texas election officials' statement "that they cannot operationalize" the new requirements, 600 League of Women Voters Texas members "face a substantial imminent risk of being disenfranchised because they must vote by mail and reside in Harris County[.]").

function of educating voters. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 378–79 (1982).[26] The chaos engendered by the Final Rule's immediate deadlines is significantly interfering with Plaintiff Organizations' mission to provide its members with accurate and reliable information about how to vote, including by mail. Pl. Orgs.' Mem. 15–18 [Doc. No. 207].[27] Plaintiff Organizations do not know whether to advise their members to vote by mail, despite legal entitlement, due to the high risk of disenfranchisement. See id. at 2.[28]

[26] See Third Canavan Decl. ¶ 51 [Doc. No. 208-4] ("The Massachusetts Secretary of the Commonwealth recommends sending in vote-by-mail applications by October 13th. To adequately educate voters by then, LWVMA should have already finalized and printed educational materials with vote-by-mail instructions.").

[27] See Third Stewart Decl. ¶ 13 [Doc. No. 208-1] ("Without an injunction of the Final Rule, we will have to educate voters about the risks of participating in a mail voting system given this change. We will need to educate voters about the risk that they may not receive mail ballots even if they are legally entitled to vote by mail under their state law. This includes updating information available in English and Spanish on VOTE411.org, as well as updating and reprinting a range of educational resources that have already been distributed to local and state Leagues, and creating new educational resources to update materials that have also already been distributed via video and social media."); Third Ngyuen Decl. ¶ 21, 28 [Doc. No. 208-3] (describing the disruption to OCA's efforts to hand out translated mail-in voting instructions in Texas); Third Washington Decl. ¶ 53 [Doc. No. 208-5] ("[T]he uncertainty the Final Rule's operation for the 2026 November election has created and will continue to create undermines Delta Sigma Theta's mission of educating members and other voters. Currently, we are unable to communicate such information to our members without any specificity, which undermines the effectiveness of our efforts and the reputation we have developed as being a trusted source of voter education.").

[28] See Third Stewart Decl. ¶ 13 [Doc. No. 208-1] ("It is antithetical to our mission to discourage any kind of participation in the democratic process, but it would also undermine our mission if we encouraged voters to vote by mail who are then disenfranchised by the Final Rule."); id. ¶ 40 (the League of Women Voters of Arkansas [] has [historically] encouraged voters to take advantage of mail voting through its state-specific VOTE411.org page, voter education presentations and workshops, email and social media communications, local League outreach, and direct responses to voters who contact them. This year, the EO has created so much uncertainty about the viability of mail voting that they have cut back on the information they provide to avoid providing inaccurate or incomplete information as implementation of the EO occurs."); id. ¶ 42 (similar issue for League of Women Voters of Louisiana, where a high population of members vote by mail due to age and disability); id. ¶ 43 (similar issue for League of Women Voters of North Dakota, where a high population of members vote by mail, "including rural, elderly, and Indigenous voters."); id. ¶ 44 (similar issue for League of Women Voters of Ohio, where a group has paused printing educational materials for mail-in voting for dispersal at

Defendants argue that Plaintiff Organizations attempt to manufacture standing by expending resources and time in response to a governmental action, and that Plaintiffs' allegations are insufficient for Article III. Defs.' Opp'n 6–7 [Doc. No. 235]. Intervenor-Defendants similarly argue that Plaintiff Organizations' "resource-diversion theory" was rejected by the Supreme Court earlier last week and that their "[f]ears about hypothetical events dependent on third parties not before the Court are not cognizable injuries." Intervenors' Opp'n 5–6 [Doc. No. 234].

Now that the Final Rule has been published and made effective as of August 21, 2026, nothing is hypothetical about Plaintiff Organizations' injuries and threatened injuries as to the November 3, 2026 election. The preliminary injunction record currently reflects the opinion of election officials in half of the States and the District of Columbia that, for various reasons and many unique to the circumstances of specific jurisdictions, it is likely impossible to comply with the Final Rule for the midterms. See Table of Decls., California II, No. 1:26-cv-13917 [Doc. No. 4]. Given this overwhelming evidence,[29] the USPS's intention to withhold noncompliant ballots

senior centers and colleges); id. ¶ 47 (similar for League of Women Voters of Utah, where a group is unable to provide clear answers to questions about mail-in voting, the primary method of voting in Utah); Third Washington Decl. ¶ 70 [Doc. No. 208-5] ("Delta Sigma Theta chapters in Texas. . . have cut back on the information they provide, to avoid providing inaccurate or incomplete information. . . already had to delay education and outreach that will result in further confusion for the electorate and impedes chapter engagement with voters which is an ongoing goal of the chapters.").

[29] Intervenor-Defendants submitted a declaration from Missouri's Secretary of State, asserting that "[a]lthough [his] staff are still figuring out some details of implementation, [Secretary Hoskins] believe[s] it is possible to implement [the Final R]ule for the 2026 General Election. Hoskins Decl. ¶ 5 [Doc. No. 234-1]. Given the granular detail provided by Plaintiff States and the District of Columbia regarding how the Final Rule affects mail ballot design, printing, processing, and mailing—as well as specifics as to Plaintiff States' voter registration database capacities—and Missouri's comparative generality, the court does not find Intervenor-Defendants' submission sufficient to rebut that of Plaintiff States.

from the mail stream makes disenfranchisement more than likely, if not probable. See infra Section III.C.2 (discussing Patrick Declaration).

Accordingly, where the USPS has now issued its Final Rule, changing the rules just months before an election and weeks before voters need to request ballots, Plaintiff Organizations' members have standing due to the likely disenfranchisement injury, and the Organizations' have standing due to the present, non-speculative interference with their core missions to educate voters.

## III. Motions for Preliminary Injunction

### *A. Standard of Review*

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The balancing of hardships and the analysis of the public interest merge when, as here, the government is the opposing party. Does 1–6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

*B. Likelihood of Success on the Merits*

1. The Final Rule is Unconstitutional[30]

First, Plaintiffs challenge the constitutionality of the Final Rule, asserting that the USPS's regulation impermissibly encroaches upon the States' and Congress's Elections Clause powers. See Pl. Orgs.' Supp. Compl. ¶¶ 69–81 [Doc. No. 205]; Pl. States' Compl. ¶¶ 138–50, California II, No. 1:26-cv-13917 [Doc. No. 1]. The court finds that Plaintiffs have established a substantial likelihood of success on this claim.

As discussed above, the Constitution's Elections Clause tasks the States with the role of election administration, subject only to Congress's superseding legislation, and the executive has no inherent authority in this joint endeavor. U.S. CONST. art. I, § 4, cl. 1.

Pursuant to its Elections Clause power, Congress has passed significant legislation "alter[ing]" the States' election practices. Id.; see also United States v. Gradwell, 243 U.S. 476, 485 (1917) ("whenever [Congress] has assumed to regulate [] elections it has done so by positive and clear statutes"). In enacting voting legislation like HAVA, NVRA, and the VRA, Congress has expressly delegated its Elections Clause power only in limited instances.[31] Otherwise, while Congress has set certain time, place, and manner restrictions pursuant to the Elections Clause, it has left further regulation to States, not federal agencies.

---

[30] Defendants and Intervenor-Defendants do not dispute that this court has jurisdiction to review Plaintiffs' constitutional claims.

[31] For example, through HAVA, Congress "established" the Election Assistance Commission, see 52 U.S.C. § 20921, and tasked the agency with specific enumerated duties, see id. § 20922, such as "develop[ing]" the standard federal mail voter registration form, "in consultation with the chief election officers of the States," see id. § 20508(a)(2). Congress also delegated to the Election Assistance Commission narrowly confined rulemaking authority necessary to carry out the agency's duties to maintain the federal registration form and make reports to Congress. See id. §§ 20929; 20508(a); see also H.R. Rep. No. 107-730, at 69 (2002) (explaining that HAVA "[p]rohibits" the EAC "from imposing any rule, regulation, or taking any action that imposes requirements on State or local governments except as permitted under the [NVRA]").

In HAVA, for example, Congress has set minimum election standards for "voting systems" that States must follow, see 52 U.S.C. § 21081, and has allowed States, not federal agencies, the ability to set more restrictive standards or rules around election administration and technology, see id. § 21084. Congress also required that a State's voter registration system be "the single system for storing and managing the official list of registered voters throughout the State" and "the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. §§ 21083(a)(1)(A)(i), (viii). Without authorization under the Elections Clause, the USPS's requirement that the States furnish a Mail-In and Absentee Participation List conflicts with Congress's requirement in HAVA that the States alone be in possession of a "single system[.]" Id.

This careful reservation is consistent with the purpose of HAVA, which sought to preserve the benefits of elections administered at the state and local level:

> The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country. Local control has the further added benefit of allowing for flexibility, so that local authorities can tailor their procedures to meet the demands of disparate and unique communities. Further by leaving the responsibility for election administration in the hands of local authorities, if a problem arises, the citizens who live within their jurisdictions know whom to hold accountable. The local authorities who bear the responsibility cannot now, and should not in the future be able to, point the finger of blame at some distant, unaccountable, centralized bureaucracy.

H.R. Rep. 107-329, at 32 (2001).

Similarly, in the VRA, to maximize enfranchisement, Congress set certain minimum voter eligibility rules around Presidential elections, including requiring States to make absentee voting available for those elections. 52 U.S.C. § 10502(b)–(f). But Congress made clear that States were free to adopt for all elections "less restrictive voting practices" than the baseline requirements set by Congress. Id. § 10502(g).

As these statutes illustrate, Congress has always respected the Elections Clause's reservation of power to the States, and has explicitly permitted the States, but not federal agencies, to legislate except where state laws would contradict or undermine congressionally set standards. Congress has never explicitly delegated its Elections Clause power to the USPS, and Defendants and Intervenor-Defendants do not claim otherwise. While all delegation issues ultimately condense to a separation-of-powers problem, see Loving v. United States, 517 U.S. 748, 758–59 (1996), because of the Elections Clause's structure, the USPS's arrogation here implicates not only Congress, but also the States. See Arizona, 570 U.S. at 9 (Congress's Elections Clause power "is paramount" but "no farther" than "it is exercised[.]") (quoting Ex parte Siebold, 100 U.S. 371, 392 (1880)).

Defendants and Intervenor-Defendants seek to avoid the Elections Clause's structure by denying that the Final Rule is an election rule. See Defs.' Opp'n 14 [Doc. No. 235]; see Intervenors' Opp'n 12 [Doc. No. 234]. This denial rings hollow. Titled "Ballot Mail for Federal Elections," the Final Rule explicitly and exclusively regulates election mail. 91 Fed. Reg. at 54990–92 (DMM. 705.24). The Final Rule does not purport to regulate any other type of mail and requires action only of the States' "chief election official[s.]" Id. Further, the USPS's cited policy justification is "the integrity of federal elections." 91 Fed. Reg. at 54966, see id. at 54976 (citing Exec. Order 14399, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," as generating the policy goals justifying the Final Rule).

Throughout its body of election legislation, Congress has never delegated its Elections Clause power to the USPS. Unauthorized by the Elections Clause, the Final Rule clashes with Congress's statutory scheme, and is unconstitutional where it intrudes not only on Congress's Elections Clause powers but also that power left to the States. Watson, 146 S. Ct. at 2181

("[S]tate law is preempted by federal statute only so far as the conflict extends.") (quotation omitted). Accordingly, the court finds Plaintiffs likely to succeed on their claim that the Final Rule is an election rule where it purports to regulate the time, place, and manner of elections and is unconstitutional where Congress has not authorized such a rule under the Elections Clause.

2. The Final Rule is Also Ultra Vires Where the USPS Enacted the Final Rule With No Statutory Authorization

Separately, the Final Rule is also ultra vires where the USPS has acted beyond any statutory authority.[32]

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." Nat'l Fed. of Indep. Bus. v. OSHA, 595 U.S. 109, 117 (2022). In promulgating the Final Rule, the USPS claims authority stemming from Congress's delegation of its legislative power to allow the USPS to do rulemaking "as may be necessary in the execution of its functions under this title." 91 Fed. Reg. at 54971 (citing 39 U.S.C. § 401(2)).[33]

Despite the Final Rule's self-avowed "modesty," the agency must derive its authority from Congress's grant of power. See THE FEDERALIST NO. 45 (J. Madison) ("The powers

[32] Defendants argue that ultra vires review is unavailable where Plaintiffs have failed to plead a specific violation of the USPS's statutory mandates. Defs.' Opp'n 8–9 [Doc. No. 235] (citing Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681–2 (2025)). However, the heightened standard set out by the Supreme Court in Nuclear Regul. Comm'n only applies where Congress has provided a reticulated judicial review scheme that allows injured parties "a meaningful and adequate opportunity for judicial review." Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc., 502 U.S. 32, 43 (1991). Where Congress has generally excepted the USPS from APA review, the court, sitting in equity, may consider whether the USPS's final actions are "outside the bounds of its statutory authority" because Plaintiffs otherwise have no access to judicial relief. City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020). Plaintiffs' ultra vires claim sits apart from their APA claim, described further below.

[33] Defendants and Intervenor-Defendants point only to this rulemaking authority and do not claim that the USPS issued the Final Rule pursuant to the President's general executive powers under Article II. See Intervenors' Opp'n 8–10 [Doc. No. 234]; Defs.' Opp'n 9 [Doc. No. 235].

delegated by the proposed Constitution to the federal government, are few and defined."). The Supreme Court has made clear that, where "the Government claim[s] broad, expansive power on an uncertain statutory basis[,]" a reviewing court may rely on the general principle that Congress does not delegate "'highly consequential power' through ambiguous language." Learning Resources v. Trump, 607 U.S. 229, 242–43 (2026) (plurality opinion) (quoting West Virginia v. EPA, 597 U.S. 697, 723–24 (2022)). Few of Congress's powers are less consequential than its supervisory authority to regulate elections, because voting is "preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).

Here, Title 39 includes no ambiguity, much less a "clear [] authorization" that Congress has provided the "sweeping delegation" of a core congressional power claimed by the USPS. Learning Resources, 607 U.S. at 248 (plurality opinion); see also id. at 279 (Gorsuch, J., concurring).[34] Title 39 excludes any reference to elections and the USPS's history of providing only non-binding guidance regarding election mail does nothing to bolster Defendants' and Intervenor-Defendants arguments.

Congress enacted Title 39 pursuant to Congress's Postal Clause power, U.S. CONST. art. I, § 8, cl. 7. In doing so, Congress delegated to the USPS a portion of its legislative power to rulemake "as may be necessary in the execution of its functions under this title." See 39 U.S.C. § 401(2). But Congress's grant does not permit the USPS to do so pursuant to any of Congress's

[34] Given the distribution of authority over elections, see supra Section III.B.1, it is worth noting that clear authorization is particularly needed where "an agency seeks to intrude into an area that is the particular domain of state law" and "risks intruding on powers reserved to the States." See West Virginia v. EPA, 597 U.S. 697, 744 (Gorsuch, J., concurring) (quotation omitted). Courts "require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." United States Forest Serv. v. Cowpasture River Preservation Assn., 590 U.S. 604, 621–22 (2020).

enumerated powers under Article I; the USPS's authority under Title 39 is strictly limited to Congress's express Postal Clause delegation. U.S. CONST. art. I, § 8, cl. 7.

In sum, Title 39 does not permit the "sweeping delegation" USPS claims here, and the court finds Plaintiffs likely to succeed on their claim that the Final Rule is ultra vires where it regulates elections beyond the bounds of the USPS's delegated authority.

3. The Final Rule Violates Title 39

In addition to the constitutional and statutory issues, the Final Rule is inconsistent with the USPS's governing statute, specifically Congress's scheme to define categories of "nonmailable" material.[35] As a starting point, the USPS's "right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress, and if no such law exists, then [the USPS] cannot exclude or refuse to deliver them." Am. School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 109 (1902). "The postal laws make a clear-cut division between mailable and nonmailable material." Hannegan v. Esquire, Inc., 327 U.S. 146, 152 (1946). Including categories such as "motor vehicle master keys," "sexually oriented advertisements," and "hazardous materials," Congress has specifically identified and delineated those types of nonmailable matter that the USPS is forbidden to transmit. 39 U.S.C. §§ 3001–3018. Nowhere in the nonmailability provisions has Congress evidenced any intent to permit the USPS to establish new nonmailable categories by rulemaking. Congress has not delegated this authority under its Postal Clause power.

The Final Rule asserts, and Defendants and Intervenor-Defendants argue, that the Final Rule does not establish a new nonmailable category, but merely imposes conditions on the

[35] While there is no dispute that the court may conduct APA review of "proceedings concerning the mailability of matter," 39 U.S.C. § 3001(m), Defendants dispute that Plaintiffs have raised such claims in their complaints. Defs.' Opp'n 14–15 [Doc. No. 235].

acceptance of mailable matter. See 91 Fed. Reg. at 54974 ("[C]onditions on the acceptance of mailable matter are distinct from a determination that the matter is nonmailable."). However, the nonmailability provisions similarly impose conditions on acceptance. See, e.g., 39 U.S.C. § 3001(d) (making nonmailable matter that "reasonably could be interpreted" as an invoice but is actually "a solicitation" for the order of goods or services, "unless such matter bears on its face, in conspicuous and legible type," a specific notice) (emphasis added). Accordingly, the court sees no distinction between the USPS's refusal to accept noncompliant mail ballots and other conditionally nonmailable materials. By establishing a new category of nonmailable materials, i.e. federal election mail, the court finds Plaintiffs likely to succeed on their claims that the Final Rule is contrary to law. 5 U.S.C. § 706(2)(A), (C).

In sum, the court finds that Plaintiff States and Organizations are also likely to succeed on the merits of their claims that the USPS exceeded its statutory authority by promulgating the Final Rule because the Constitution reserves election regulation to Congress and the States, Congress has not authorized the USPS to make requirements of States before permitting use of the USPS for mailing their ballots, and that the Final Rule impermissibly establishes a new category of nonmailable material. [36]

---

[36] Plaintiffs assert additional claims, including that the Final Rule violates the USPS's universal service mandate, discrimination prohibition, authority to implement non-postal services, and requirement to seek an advisory opinion of the USPS's overseeing body, the PRC. See Pl. Orgs.' Supp. Compl. ¶¶ 82–98 [Doc. No. 205]; Pl. States' Compl. ¶¶ 169–96, California II, No. 1:26-cv-13917 [Doc. No. 1]. With respect to these alleged violations, Plaintiffs argue that the USPS has exceeded the bounds of its delegated authority in issuing the Final Rule. Plaintiff States also assert that, in publishing the Final Rule, the USPS violated the Voting Rights Act and the Privacy Act. See Pl. States' Compl. ¶¶ 197–217, California II, No. 1:26-cv-13917 [Doc. No. 1]. Given the narrow inquiry inherent in reviewing a motion for a preliminary injunction, the court does not reach the arguments that the Final Rule violates additional provisions of Title 39, the Voting Rights Act, or the Privacy Act. Similarly, the court need not determine that Congress would be unable to delegate the grant claimed by the USPS.

*C. Irreparable Harm*

1. Plaintiff States

The most patent of the harms alleged by Plaintiff States is their inability to comply with the Final Rule for the November 3, 2026 elections and the consequences of noncompliance. Plaintiff States are required under state law to mail millions of ballots to voters on a prescribed timeframe.[37] As detailed below, they are unable to pivot this late in the election cycle, nearly

[37] Southard Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-1] ("Pursuant to California law, California election officials must ensure that mail ballots are sent to all active registered voters in the state. Therefore, we anticipate that county election officials will mail more than 23 million ballots to voters during the November 2026 General Election."); Tassinari Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-2] ("Massachusetts anticipates mailing ballots to approximately 1 million voters during the 2026 general election beginning in mid-September."); Wlaschin Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-3] (Nevada "anticipates county election officials mailing approximately 2.1 million ballots to voters during the 2026 general election."); Holmes Decl. ¶ 10, California II, No. 1:26-cv-13917 [Doc. No. 4-4] ("Washington anticipates mailing ballots to approximately 5.1 million voters during the 2026 general election during the period from September 19, 2026, to October 27, 2026."); Fontes Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-5] ("Arizona counties anticipate mailing ballots to approximately 3,200,000 voters during the 2026 General Election during the period from September 19, 2026 (for UOCAVA voters) to October 23, 2026, with the vast majority being mailed on or around October 7, 2026."); Rudy Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-6] ("Colorado anticipates mailing ballots to more than 4,000,000 voters during the 2026 general election during the period from September 19, 2026, to October 26, 2026."); Rosenberg Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-7] ("Connecticut anticipates mailing ballots to approximately 175,000 to 200,000 voters during the 2026 general election during the period from October 2, 2026 to November 2, 2026."); Albence Decl. ¶ 18, California II, No. 1:26-cv-13917 [Doc. No. 4-8] ("Delaware anticipates mailing ballots to approximately 50,000 voters during the 2026 general election during the period from September 19 to October 30th."); Miller Decl. ¶ 8, California II, No. 1:26-cv-13917 [Doc. No. 4-9] ("For the November 2026 election, ballot mailing will begin on September 30, 2026. [The District of Columbia Board of Elections] anticipates mailing ballots to approximately 448,823 registered voters."); Nago Decl. ¶ 19, California II, No. 1:26-cv-13917 [Doc. No. 4-10] ("Hawai'i anticipates mailing ballots to over 700,000 voters during the 2026 general election."); Flynn Decl. ¶ 18, California II, No. 1:26-cv-13917 [Doc. No. 4-11] ("Maine anticipates mailing ballots to approximately 200,000 voters during the 2026 general election during the period from October 3 to October 29, 2026."); Dorsey Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-12] ("Maryland anticipates mailing ballots to approximately 585,000 voters during the 2026 general election during the period from September 21, 2026 to October 27, 2026. . . . Roughly 72,000 [additional] ballots are expected to be delivered by email and returned by mail."); Brater Decl.

¶ 31, California II, No. 1:26-cv-13917 [Doc. No. 4-13] ("Michigan anticipates mailing ballots to a minimum of 1.9 million U.S-based voters during the 2026 general election during the period from approximately September 19, 2026, to October 30, 2026."); Linnell Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-14] ("Minnesota anticipates that at least 500,000 voters will receive mail ballots during the 2026 general election during the period from September 18 to November 2."); Barber Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-15] ("New Jersey anticipates mailing ballots to approximately 900,000 voters during the 2026 general election during the period from September 19, 2026, to October 27, 2026."); Vigil Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-16] ("Based on 2024 general election figures, New Mexico anticipates mailing ballots to approximately 111,403 voters during the 2026 general election during the period from October 6, 2026, to October 20, 2026."); Stavisky Decl. ¶ 15, California II, No. 1:26-cv-13917 [Doc. No. 4-17] ("Based on prior elections, [New York election official] anticipate[s] that local boards will need to process more than 600,000 early mail and absentee ballots requests for the November 2026 general election. This is a conservative estimate that comports with the 536,171 ballots sent out for the 2022 midterm election and accounts for an increase owing to the universal availability of early vote by mail ballots which were not a feature of New York's voting system in 2022."); Brunton Decl. ¶ 14, California II, No. 1:26-cv-13917 [Doc. No. 4-18] ("Based on the number of mail ballot requests submitted for the 2022 general election, North Carolina anticipates mailing ballots starting September 4, 2026, to approximately 260,000 eligible voters during the 2026 general election."); Dawson Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-19] ("Oregon anticipates mailing ballots to approximately 3 million voters during the 2026 general election, typically during the period from October 14, 2026 (20 days before the election) to October 20, 2026 (14 days before the election). [Or. Rev. Stat. §] 254.470(2)(a). Ballots will be mailed to UOCAVA voters not later than September 19, 2026 (45 days before the election) and to absentee voters starting on October 5, 2026 (29 days before the election). [Or. Rev. Stat. §] 253.065(1)"); Marks Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-20] ("Pennsylvania anticipates that 2026 mail ballot requests will be comparable to the requests submitted in the 2024 presidential election, when nearly 2.2 million (23 percent) of all registered voters requested a mail ballot."); Rock Decl. ¶ 23, California II, No. 1:26-cv-13917 [Doc. No. 4-21] ("Rhode Island anticipates mailing ballots to approximately 30,000 voters during the 2026 general election in the 30-day period before election day; for the 2024 general election, Rhode Island sent approximately 55,000 mail ballots to voters but historically receives less requests for mail ballots in midterm cycles."); Hanzas Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-22] ("Vermont anticipates mailing ballots to approximately 460,000 voters during the 2026 general election during the period from September 19 to October 1."); Koski Decl. ¶ 22, California II, No. 1:26-cv-13917 [Doc. No. 4-23] ("Virginia anticipates mailing over 400,000 ballots during the General Election during the period from September 18 through approximately October 26 (the final day for requesting is October 23)."); Michalowski Decl. ¶ 35, California II, No. 1:26-cv-13917 [Doc. No. 4-24] (Cook County, Illinois Clerk's Office "anticipates mailing at least 225,000 ballots to voters during the 2026 general election."); Millis Decl. ¶¶ 16–17, California II, No. 1:26-cv-13917 [Doc. No. 100-1] ("In Wisconsin, many voters vote an absentee ballot by mail. During the General Election of 2022, 427,246 non-UOCAVA voters voted an absentee ballot by mail, and in 2024, 572,424 non-UOCAVA voters voted an absentee ballot by mail. As of the morning of August 31, 2026, 270,964 non-UOVAVA by-mail absentee ballots have already been requested by Wisconsin

guaranteeing significant disenfranchisement for eligible voters. The court describes the practical limitations as follows.

a. Design Requirements

First, the Final Rule requires that the States use ballot envelopes with mandatory design requirements, including (1) the official Election Mail logo; (2) automation compatibility; and (3) a unique Intelligent Mail Barcode assigned to a specific voter that is created by the Authorized Ballot Mailer and has the appropriate delivery address zip code embedded and a Federal Ballot Mail Service Type Identifier. 91 Fed. Reg. 54990–91 (DMM 705.24.3.1–2). These requirements apply to both outbound mail ballot and voters' return ballot envelopes. Id. Chief among election officials' concerns is that most jurisdictions are not required to use Intelligent Mail Barcodes on their mail ballot envelopes, do not use them at all or at least not on return envelopes, and must redesign their envelopes to include sufficient space for the barcodes.[38]

Plaintiff States have already purchased ballots and envelopes that do not comply with the Final Rule and will need to replace them if the Final Rule is implemented.[39] Plaintiff States'

---

voters for the November 3, 2026, General Election. Clerks were permitted to begin fulfilling these requests as soon as the August 11, 2026, Partisan Primary was certified, meaning that clerks are currently working to fulfill these requests.").

[38] See, e.g., Rudy Decl. ¶ 42, California II, No. 1:26-cv-13917 [Doc. No. 4-6] (Colorado); Rosenberg Decl. ¶ 42, California II, No. 1:26-cv-13917 [Doc. No. 4-7] (Connecticut); Albence Decl. ¶ 22(c), California II, No. 1:26-cv-13917 [Doc. No. 4-8] (Delaware); Flynn Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-11] (Maine); Dorsey Decl. ¶ 13, California II, No. 1:26-cv-13917 [Doc. No. 4-12] (Maryland); Brater Decl. ¶ 41, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (Michigan); Millis Decl. ¶ 30, California II, No. 1:26-cv-13917 [Doc. No. 100-1] (Wisconsin).

[39] See Southard Decl. ¶ 39, California II, No. 1:26-cv-13917 [Doc. No. 4-1] (California); Tassinari Decl. ¶ 45, California II, No. 1:26-cv-13917 [Doc. No. 4-2] (Massachusetts); Holmes Decl. ¶ 42, California II, No. 1:26-cv-13917 [Doc. No. 4-4] (Washington); Fontes Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-5] (Arizona); Rudy Decl. ¶ 41, California II, No. 1:26-cv-13917 [Doc. No. 4-6] (Colorado); Rosenberg Decl. ¶ 41, California II, No. 1:26-cv-13917 [Doc. No. 4-7] (Connecticut); Albence Decl. ¶ 33, California II, No. 1:26-cv-13917 [Doc. No. 4-8] (Delaware); Nago Decl. ¶ 43, California II, No. 1:26-cv-13917 [Doc. No. 4-10]

vendors have stated that it would be impossible to rush-print more envelopes or have not responded to States' inquiries.[40]

In its response to comments, the USPS notes that it provides an online tool enabling "small-volume mailers" to generate unique Intelligent Mail Barcodes free of cost. 91 Fed. Reg. at 54979. Election officials respond that this does not resolve the redesign issue and that, in any event, jurisdictions who print more than 50,000 mailpieces are unable to use the "small-volume" tool.[41]

Additionally, some jurisdictions, particularly small rural ones, lack the ability to print Intelligent Mail Barcodes.[42] Others are precluded by state law from including an Intelligent Mail

---

(Hawai'i); Flynn Decl. ¶ 35, California II, No. 1:26-cv-13917 [Doc. No. 4-11] (Maine); Dorsey Decl. ¶ 10, California II, No. 1:26-cv-13917 [Doc. No. 4-12] (Maryland); Brater Decl. ¶ 43, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (Michigan); Linnell Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-14] (Minnesota); Barber Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-15] (New Jersey); Stavisky Decl. ¶ 47, California II, No. 1:26-cv-13917 [Doc. No. 4-17] (New York); Brunton Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-18] (North Carolina required to mail ballots on September 4, 2026); Dawson Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-19] (Oregon); Marks Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-20] (Pennsylvania); Rock Decl. ¶ 40, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (Rhode Island); Hanzas Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-22] (Vermont); Michalowski Decl. ¶ 36, California II, No. 1:26-cv-13917 [Doc. No. 4-24] (Cook County, Illinois); Millis Decl. ¶ 13, California II, No. 1:26-cv-13917 [Doc. No. 100-1] (Wisconsin).

[40] See, e.g., Holmes Decl. ¶ 42, California II, No. 1:26-cv-13917 [Doc. No. 4-4] ("After publication of the Rule, [Washington election official] immediately began contacting the vendors that Washington counties use to print election materials. Of those three vendors, one vendor indicated that it could not reprint ballot envelopes after August 27, 2026 and another vendor indicated that it did not have capacity to reprint ballot envelopes at all. [Official] ha[s] not heard back from the third vendor, but it would be very unlikely that the printer could reprint all ballot envelopes for the entire State. In [official's] experience, these types of large-volume printing projects are scheduled months in advance.").

[41] See, e.g., Nago Decl. ¶ 45, California II, No. 1:26-cv-13917 [Doc. No. 4-10] (Hawai'i) (citing USPS, Intelligent Mail for Small Business (IMsb) Fact Sheet (June 1, 2024) (accessible at https://postalpro.usps.com/mailing/imsb/fact_sheet).

[42] See, e.g., Wlaschin Decl. ¶ 23, California II, No. 1:26-cv-13917 [Doc. No. 4-3] (for "individually sent ballots that originate from [Nevada] county offices," "there is no way to print an IMB on an individual envelope[.]"); Millis Decl. ¶¶ 30–31, California II, No. 1:26-cv-

barcode on their return envelopes.[43] Others issue mail ballots via email or online and have no way to include a barcode in that format.[44] Finally, election officials' reports that Intelligent Mail Barcodes have previously had "a low scan rate" for mail ballots present further untenable problems.[45]

In sum, the Final Rule's ballot design requirements, imposed just days or weeks before ballots need to be mailed under state laws for the 2026 midterm elections, will cause Plaintiff States irreparable harm.

b. Approval

Second, the Final Rule requires that election officials receive USPS approval of their designs for both outbound and return mail ballot envelopes, see 91 Fed. Reg. at 54990–91 (DMM 705.24.3.1–2), and certify as much, see id. at 54991 (DMM 705.24.4.2(f)). The USPS has historically provided feedback to requesting election officials but has never before required

13917 [Doc. No. 100-1] (Wisconsin lacks the capability to print any IMBs on "return envelopes," and while larger cities may be able to print IMBs for outbound mail, "[h]undreds of small, rural Wisconsin towns and villages . . . likely do not have the required label printing capability. . . . Wisconsin's rural municipalities are thus at a significant disadvantage compared to Wisconsin's biggest cities.").

[43] See, e.g., Rock Decl. ¶ 18, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (Rhode Island) ("[E]ven if Rhode Island's vendor had time to reprint the state's return ballot envelopes, the vendor is unable to put an Intelligent Mail barcode on the state's return mail envelopes because Rhode Island, as required by state law, uses an external envelope for mail processing and an internal certifying envelope placed within it that contains the sealed ballot.") (citing R.I. Gen. Laws §§ 17-20-19 and 17-20-21).

[44] See, e.g., Nago Decl. ¶ 8, California II, No. 1:26-cv-13917 [Doc. No. 4-10] (In Hawai'i, "the county clerks have the ability to email ballots to voters in special circumstances, such as military and overseas voters and voters with disabilities, that request for their ballots to be transmitted in that manner."); Dorsey Decl. ¶ 33 [Doc. No. 4-12] ("70,000–100,000 [Maryland] voters use [online ballot delivery] each election cycle.").

[45] See Wise Decl. ¶¶ 44–45, California II, No. 1:26-cv-13917 [Doc. No. 24-25] (King County, Washington in the February 2025 special election attempted to use Intelligent Mail Barcodes and observed that "only a small percentage of returned ballots actually received scans from USPS.").

approval as a condition of sending mail ballots through the Postal Service. See id. at 54979 ("The mailpiece design review referenced in [DMM] 705.24.3 is the existing [Mail Design Analyst] review process that many in the election community already utilize."). In answers to comment, the USPS stated that Mail Design Analysts "typically aim to provide feedback to mailers within 2 business days after receiving the mailer's request[.]") Id. Defendants assert that this reference in the Final Rule to two business days means that the approval process typically takes two days. See Defs.' Opp'n 29 n.5 [Doc. No. 235]. But the aspirational two-day turnaround set forth in the Final Rule is belied by the record. The only evidence before the court as to the turnaround is that, regardless of the USPS's aspirations, the time is measured in weeks or months, not days.[46]

In any event, the historical timeframe for "provid[ing] feedback" does not necessarily equate to how much time it will take the USPS to sign off on a State or local election official's design. 91 Fed. Reg. at 54979. Nor does it account for the timeline at issue here where compliance with the Final Rule will require simultaneous review of hundreds or thousands of ballot envelopes and return envelopes,[47] and the USPS has disclaimed any intention to hire

[46] See, e.g., Flynn Decl. ¶¶ 37–38, California II, No. 1:26-cv-13917 [Doc. No. 4-11] ("Maine is currently using a ballot envelope design that was reviewed by USPS a number of years ago and has not changed since. USPS took weeks to approve those envelope designs."); Brater Decl. ¶ 41, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (In Michigan, "[l]ocalities currently submit ballot envelopes to USPS for design review. This process takes weeks at minimum to complete for each locality's envelope."); Hanzas Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-22] ("For Vermont, with 494 different ballot styles and corresponding ballot envelope styles, the approval of [Vermont's] ballot envelope styles took approximately 3 months. After all of that work, the USPS has requested changes for 247 envelope styles. [Vermont election official's] team is still working through those changes.").

[47] See, e.g., Tassinari Decl. ¶¶ 12, 45, 48, California II, No. 1:26-cv-13917 [Doc. No. 4-2] (Massachusetts has 351 ballot envelope styles); Brater Decl. ¶ 41, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (Michigan uses 1,521 different ballot envelope styles); Hanzas Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-22] (Vermont has 494 different ballot envelope styles).

additional staff. See 91 Fed. Reg. at 54986. Further, the Final Rule excludes any detail as to how the USPS intends to handle States' disagreement with the USPS's feedback.

In light of the extraordinarily condensed timeframe, the approval process, and the absence of an appeals or escalation process support Plaintiff States' claims of irreparable harm.

c. Portal Enrollment

State election officials are also deeply concerned with the Final Rule's requirement that, after ballot approval, all absentee voters' information must be uploaded to the USPS portal.[48] The Portal is not currently operational and the USPS plans to make the Portal available "sometime next week." See Monteith Decl. ¶ 3 [Doc. No. 280-1]. As a preliminary matter, some States forbid the disclosure of voter information in certain instances, for example under confidentiality laws protecting victims of domestic abuse or intimate partner violence.[49] Contrary to Defendants'

[48] See, e.g., Stavisky Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-17] ("But even if USPS's untested Ballot Portal works as intended and does not experience technical problems—which again seems highly unlikely—enrolling the roughly 600,000 voters registered in New York with USPS who will need to receive mail ballots will be a massive undertaking. This task will be significantly complicated by the influx of registration updates and changes that election officials typically receive in the months, weeks, and days before any election. In the 30 days prior to the November 2024 election, more than 200,000 individuals registered to vote in New York. More than 100,000 voters did so in the same period before the November 2025 general election. Again, under New York law, voters may register to vote and request a mail ballot up until the start of early voting (10 days prior to election day) meaning that local boards and the [New York State Board of Elections] will likely need to enroll new voters requesting a mail ballot with the USPS in close proximity to election day and while voting is actively ongoing.").

[49] See, e.g., Southard Decl. ¶ 22, California II, No. 1:26-cv-13917 [Doc. No. 4-1] ("California law allows voters that meet certain qualifications to register as 'confidential voters' for a variety of reasons, including personal safety, life threatening circumstances as determined by a California court, and a person's role as a public safety officer, election worker, and candidate or elected official. . . . State law prohibits California from including confidential voters' information on any roster or list.") (citing Cal. Elec. Code § 2166); Fontes Decl. ¶ 19, California II, No. 1:26-cv-13917 [Doc. No. 4-5] (Arizona law protects certain voters' information by statute "because they are police officers, judges, or victims of sexual violence or stalking. . . . [I]t is a crime for election officials to distribute information about secured voters outside of specific exceptions provided by law."); Vigil Decl. ¶ 18, California II, No. 1:26-cv-13917 [Doc. No. 4-16] ("New Mexico law also provides for special mailed ballot voting to protect those who have survived

assertions, see Defs.' Opp'n 1 [Doc. No. 235], the Final Rule directly conflicts with these state laws. Notably, Defendants make no effort to explain how States can both comply with the requirement to upload voter information, including addresses, to the USPS portal without violating their state laws and disclosing confidential voter information.

Next, the Portal requires an overwhelming expenditure of time by election officials. The Final Rule requires that each State's chief election official authorize other officials to use the Portal. 91 Fed. Reg. at 54991 (DMM 705.24.4.1). In jurisdictions where elections are administered at the county or municipal level, the Final Rule requires either the Secretary of State or a deputy to authorize thousands of Portal users.[50] After those users are authorized, they must enter each voter's data into the system, including name, address, Intelligent Mail Barcodes, and the originating election office State. 91 Fed. Reg. at 54991 (DMM 705.24.4.2(b)). Because the Portal is not currently accessible, it is unclear whether States will have the ability to migrate data from their electronic voter registration systems (mandated by HAVA) or whether they will have to manually enter each voter's information. Even if States were able to transfer data,

---

violence from an intimate partner by utilizing a confidential address program) (citing N.M. Stat. § 1-6C-1, et seq. (2019)); Stavisky Decl. ¶ 24 California II, No. 1:26-cv-13917 [Doc. No. 4-17] (New York has a "Confidential Voter system," protecting victims of domestic violence) (citing N.Y. Elec. Law § 5-508); Koski Decl. ¶ 20, California II, No. 1:26-cv-13917 [Doc. No. 4-23] ("Virginia protects the privacy of its mail ballot voters by allowing disclosure of lists of voters casting ballots by mail only to certain individuals and entities under certain circumstances. Registrars can only allow in-person inspection and copying of lists of mail voters, and only to registered voters in Virginia.") (citing Va. Code § 24.2-706(A)); Wise Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-25] (Washington's Address Confidentiality Program . . . offers survivors of domestic violence, sexual assault, stalking, or trafficking, and Criminal Justice Affiliates, Election Officials, and Protected Health Care Workers who are a target for threats or harassment, a substitute address to receive first class mail.").

[50] See, e.g., Millis Decl. ¶¶ 4, 21, 23, California II, No. 1:26-cv-13917 [Doc. No. 100-1] (In Wisconsin, "[e]lections are primarily administered at the local level by 1,850 municipal clerks," and "2,500-plus municipal employees," would need to be authorized to use the Portal, rendering compliance "virtually impossible[.]").

notwithstanding privacy concerns, Plaintiff States do not track Intelligent Mail Barcode information on their outbound mail in those systems,[51] requiring Barcodes to be manually entered. Plaintiff States provide various estimates on how long it would take their staff to complete this task, but all characterize uploading voter data to the Portal for the midterms as a massive undertaking and seriously doubt their ability to do so.[52]

---

[51] See, e.g., Southard Decl. ¶ 19, California II, No. 1:26-cv-13917 [Doc. No. 4-1] (California's statewide voter registration system "is not currently equipped to receive IMb information for individual voters from county election management systems[, which] will also need to be updated to store and transmit [IMb] information to" the statewide system.); Tassinari Decl. ¶ 33, California II, No. 1:26-cv-13917 [Doc. No. 4-2] (same for Massachusetts); Rosenberg Decl. ¶ 29, California II, No. 1:26-cv-13917 [Doc. No. 4-7] (same for Connecticut).

[52] See Southard Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-1] (California); Tassinari Decl. ¶ 32, California II, No. 1:26-cv-13917 [Doc. No. 4-2] (Massachusetts); Wlaschin Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-3] (Nevada); Holmes Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-4] (Washington); Fontes Decl. ¶ 24, California II, No. 1:26-cv-13917 [Doc. No. 4-5] (Arizona); Rudy Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-6] (Colorado); Rosenberg Decl. ¶ 29, California II, No. 1:26-cv-13917 [Doc. No. 4-7] (Connecticut); Albence Decl. ¶ 22, California II, No. 1:26-cv-13917 [Doc. No. 4-8] (Delaware); Miller Decl. ¶ 19, California II, No. 1:26-cv-13917 [Doc. No. 4-9] (D.C.); Nago Decl. ¶ 23, California II, No. 1:26-cv-13917 [Doc. No. 4-10] (Hawai'i); Flynn Decl. ¶ 22, California II, No. 1:26-cv-13917 [Doc. No. 4-11] (Maine); Dorsey Decl. ¶ 30, California II, No. 1:26-cv-13917 [Doc. No. 4-12] (Maryland); Brater Decl. ¶ 35, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (Michigan); Linnell Decl. ¶ 24, California II, No. 1:26-cv-13917 [Doc. No. 4-14] (Minnesota); Barber Decl. ¶ 24, California II, No. 1:26-cv-13917 [Doc. No. 4-15] (New Jersey); Vigil Decl. ¶ 29, California II, No. 1:26-cv-13917 [Doc. No. 4-16] (New Mexico); Stavisky Decl. ¶ 30, California II, No. 1:26-cv-13917 [Doc. No. 4-17] (New York); Brunton Decl. ¶ 15, California II, No. 1:26-cv-13917 [Doc. No. 4-18] (North Carolina); Dawson Decl. ¶ 24, California II, No. 1:26-cv-13917 [Doc. No. 19] (Oregon); Marks Decl. ¶ 23, California II, No. 1:26-cv-13917 [Doc. No. 4-20] (Pennsylvania); Rock Decl. ¶ 27, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (Rhode Island); Hanzas Decl. ¶¶ 21, 23, California II, No. 1:26-cv-13917 [Doc. No. 4-22] (Vermont); Koski Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-23] (Virginia); Michalowski Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-24] (Cook County, Illinois); Wise Decl. ¶ 42, California II, No. 1:26-cv-13917 [Doc. No. 4-25] (King County, Washington); Millis Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 100-1] (Wisconsin).

Finally, given the unproven nature of the new technology, the election officials' concerns that the USPS has declined to publish a contingency plan for if the Ballot Portal is not operational or user-error impedes the process are well-founded.[53]

d. Sending Outbound Ballot Mail

Finally, after redesigning ballot envelopes and return envelopes as necessary, obtaining the USPS's approval of the envelopes, certifying compliance with these steps, and uploading voter information (including Intelligent Mail barcodes), the Final Rule requires that election officials must present for acceptance and verification outbound mail ballots destined for voters at a "facility that performs business mail acceptance functions or at a Postal Service retail counter." 91 Fed. Reg. at 54991 (DMM 705.24.5.2). The Final Rule instructs that each ballot envelope's Intelligent Mail Barcode must be individually scanned and that election officials should remain

---

[53] See Southard Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-1] (California); Tassinari Decl. ¶ 35, California II, No. 1:26-cv-13917 [Doc. No. 4-2] (Massachusetts); Wlaschin Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-3] (Nevada); Holmes Decl. ¶ 30, California II, No. 1:26-cv-13917 [Doc. No. 4-4] (Washington); Fontes Decl. ¶ 28, California II, No. 1:26-cv-13917 [Doc. No. 4-5] (Arizona); Rudy Decl. ¶ 32, California II, No. 1:26-cv-13917 [Doc. No. 4-6] (Colorado); Rosenberg Decl. ¶ 31, California II, No. 1:26-cv-13917 [Doc. No. 4-7] (Connecticut); Albence Decl. ¶ 23, California II, No. 1:26-cv-13917 [Doc. No. 4-8] (Delaware); Miller Decl. ¶ 21, California II, No. 1:26-cv-13917 [Doc. No. 4-9] (D.C.); Nago Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-10] (Hawai‘i); Flynn Decl. ¶ 25, California II, No. 1:26-cv-13917 [Doc. No. 4-11] (Maine); Dorsey Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-12] (Maryland); Brater Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-13] (Michigan); Linnell Decl. ¶ 27, California II, No. 1:26-cv-13917 [Doc. No. 4-14] (Minnesota); Barber Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-15] (New Jersey); Vigil Decl. ¶ 33, California II, No. 1:26-cv-13917 [Doc. No. 4-16] (New Mexico); Stavisky Decl. ¶ 34, California II, No. 1:26-cv-13917 [Doc. No. 4-17] (New York); Brunton Decl. ¶ 18, California II, No. 1:26-cv-13917 [Doc. No. 4-18] (North Carolina); Dawson Decl. ¶ 27, California II, No. 1:26-cv-13917 [Doc. No. 19] (Oregon); Marks Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-20] (Pennsylvania); Rock Decl. ¶ 30, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (Rhode Island); Hanzas Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-22] (Vermont); Koski Decl. ¶ 26, California II, No. 1:26-cv-13917 [Doc. No. 4-23] (Virginia); Michalowski Decl. ¶ 27, California II, No. 1:26-cv-13917 [Doc. No. 4-24] (Cook County, Illinois); Wise Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-25] (King County, Washington).

on site "during the verification process." Id. at 54981. While the Final Rule states that "[s]canning a barcode generally takes less than a minute per mailpiece," id., this compounds to substantial time for States with large mailings. For example, California, Colorado, Hawai'i, Nevada, Oregon, Utah, Vermont, Washington, and the District of Columbia mail all of their voters a ballot. See Cal. Elec. Code § 3000.5; Colo. Rev. Stat. § 1-5-401; D.C. Code § 1–1001.05; Haw. Rev. Stat. § 11-101; Nev. Rev. Stat. § 293.269911; Or. Rev. Stat. § 254.465; Utah Code § 20A-3a-202; Vt. Stat. tit. 17, § 2537a; Wash. Rev. Code § 29A.40.010. Accordingly, the "less than a minute per mailpiece" verification requirement "would constitute an immense amount of time for USPS to process ballots for California, [for example,] which will by law be mailing more than 23 million ballots in November."[54]

e. Election Officials are Busy Administering Elections

The Final Rule's new requirements would be an extraordinary amount of work for local officials at any time. But imposing these mandates on election officials at present poses greater difficulties than otherwise because election officials are actively administering elections.[55]

---

[54] Southard Decl. ¶ 37, California II, No. 1:26-cv-13917 [Doc. No. 4-1].

[55] See, e.g., Albence Decl. ¶ 55, California II, No. 1:26-cv-13917 [Doc. No. 4-8] ("Any time spent by current staff on implementing the Rule would divert time and attention from other critical election preparation in the days leading up to the election, [Delaware election] office's busiest time. [Office] staff is already at capacity and dedicated to routine tasks and special projects that ensure Delaware's elections run smoothly and every eligible Delawarean can exercise their right to vote. This work becomes more voluminous, significant, and urgent in the months leading up to the election, when [Delaware election office] must answer an increasing volume of questions and handle tasks related to, for example, campaign finance reporting, logic and accuracy testing, and voter challenges.").

Some States have primaries in early September.[56] Accordingly, these States are only now finding out what the November ballot will say.[57] And notwithstanding September primaries, all States are consumed with the task of registering voters, maintaining voter lists, conducting early voting, processing vote-by-mail applications, mailing ballots to voters, preparing voter lists, appointing poll workers, and tabulating votes.[58] Voter registration alone is an unwieldy task, where, in many States, voters can register as late as election day.[59] Accordingly, the onus of the Final Rule's requirements falls on State and local election official officials to somehow find the time and resources to comply with the Final Rule in the middle of election season.

2. Plaintiff Organizations' Members

On the record before this court, the myriad aforementioned obstacles and negligible amount of time for officials to familiarize themselves with new processes (let alone successfully implement the new requirements) will make compliance by State and local officials with the

[56] See, e.g., Tassinari Decl. ¶ 9 [Doc. No. 4-2] (Massachusetts); Albence Decl. ¶ 7, California II, No. 1:26-cv-13917 [Doc. No. 4-8] (Delaware); Rock Decl. ¶ 9, California II, No. 1:26-cv-13917 [Doc. No. 4-21] (Rhode Island).

[57] See, e.g., Tassinari Decl. ¶ 63, California II, No. 1:26-cv-13917 [Doc. No. 4-2] ("Immediately after the [Massachusetts] primary results are tallied, [Massachusetts election] office will begin the process of creating and proof-reading the ballots for the November election. This process is extremely labor intensive as there will be over 500 ballot styles including over 1,000 candidate names, nine (9) statewide ballot questions and other questions in certain districts and municipalities. [Massachusetts election office] already ha[s] trainings planned for local election officials as well. Local election officials will continue to receive voter registration and vote by mail applications as well. Additionally, local election officials will be finalizing their lists of poll workers and assignments, training those poll workers, conducting in-person early voting and testing voting equipment.").

[58] See, e.g., Barber Decl. ¶ 7, California II, No. 1:26-cv-13917 [Doc. No. 4-15] (Explaining New Jersey's election administration responsibilities).

[59] See, e.g., Nago Decl. ¶ 56, California II, No. 1:26-cv-13917 [Doc. No. 4-10] ("[Hawaiʻi Office of Elections] will need to continue to register those who are eligible to vote in Hawaiʻi. Hawaiʻi allows qualified individuals to register in person on Election Day.") (citing Haw. Rev. Stat. § 11-15.2).

Final Rule "virtually impossible" for the November 3, 2026 midterm elections.[60] And because the USPS has conditioned sending mail ballots on compliance, disenfranchisement of Plaintiff Organizations' members is unavoidable, rather than hypothetical for the upcoming elections. See Fish v. Kobach, 840 F.3d 710, 752 (10th Cir. 2016) ("[T]here can be no 'do-over' or redress of a denial of the right to vote after an election[.]").

Intervenor-Defendants' assurance that compliance will be feasible in their States seems implausible given the practical implications of the Final Rule. See Intervenors' Opp'n 18–19 [Doc. No. 234]. As assessed by an expert in election administration, as to all States, "[n]one of the Rule's requirements can feasibly be implemented before the November 3, 2026 General Election." Patrick Decl. ¶ 18 [Doc. No. 264-1].[61] The budgets for election administration have already been set, id. ¶ 34, State election training and procedures have largely already been finalized, id. ¶ 33, and States typically stagger the types of changes mandated by the Final Rule (like ballot redesign) across odd-numbered years off cycle from federal elections, to allow sufficient time for proper implementation, id. ¶ 85. Now, 60 days before the November 3, 2026 midterms, the Final Rule would require 10,000 different election jurisdictions to conform to new ballot design requirements (requiring many to re-design their ballots), have a wave of new designs undergo Mail Design Analyst review, id. ¶ 79, print new designs from their vendors

[60] Millis Decl. ¶ 26 [Doc. No. 100-1] (Wisconsin Election Commission Chair states "it would be virtually impossible to ensure that each absentee voter in Wisconsin is enrolled [in the USPS Portal].").

[61] The court takes judicial notice of the Declaration of Tammy Patrick, an election administration expert, submitted to the United States District Court for the District of Columbia in DSCC v. Trump, No. 1:26-cv-1114 (D.D.C. Aug. 28, 2026) (Dkt. No. 171-3), and filed in this court by Amici Curiae League of United Latin American Citizens; Secure Families Initiative; Arizona Students' Association; City of Madison, Wisconsin; Travis County, Texas; and Travis County Clerk, who are plaintiffs in the D.C. case. See Fed. R. Evid. P. 201; Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 308 F.R.D. 39, 52 (D. Mass.), aff'd, 807 F.3d 472 (1st Cir. 2015).

(typically ranging from four to sixteen weeks in lead time), id. ¶ 86, and then, contingent on technological capabilities, collate and submit voter information to a portal that does not yet exist and has not been proven to work, id. ¶¶ 94, 97; see Monteith Decl. ¶ 3 [Doc. No. 280-1]. Having considered this series of hurdles for officials against the backdrop of an impending election, and mindful of the fact that any minor malfunction will result in the denial of mail ballots, the court concludes that disenfranchisement for Plaintiff Organizations' members, regardless of residence, is practically inevitable.

*D. Balance and the Public*

Defendants claim irreparable harm where injunctive relief would "thwart the Postal Service" from implementing a regulation that USPS concluded had significant "visibility and law enforcement benefits[.]" Defs.' Opp'n 21 [Doc. No. 235]. Intervenor-Defendants assert that they are irreparably harmed by injunctive relief that precludes their desired compliance with the Final Rule. Intervenors' Opp'n 18–19 [Doc. No. 234]. While acknowledging "an ongoing debate on how common fraud is in mail voting," Intervenor Missouri's Secretary of State asserts that an injunction would prevent Missouri from "benefitting from the increase in security to mail voting [] guarantee[ed]" by compliance with the Final Rule. Hoskins Decl. ¶¶ 3, 8 [Doc. No. 234-1].

In balancing the harms based on the record before the court, the court finds, on one side, that immediate implementation of the Final Rule issued less than seventy days before the November 2026 election threatens disenfranchisement of millions of United States citizens who seek to vote by mail, see Wesberry v. Sanders, 376 U.S. 1, 17 (1964) (referencing this eminently "precious" right) and, on the other side, that the record includes no evidence relating to

fraudulent mail voting to support the rushed implementation of the Final Rule.[62] The court finds moreover that enjoining the Final Rule's mandatory provisions cannot harm the USPS or any State where "there is generally no public interest in the perpetuation of unlawful agency action[.]" Rhode Island v. Trump, 155 F.4th 35, 50 (1st Cir. 2025); see also Monteith Decl. ¶ 3 [Doc. No. 280-1] (asserting that the Portal is not currently operational).

At the same time, the court has not and will not order injunctive relief that precludes States from voluntarily complying with the Final Rule, consistent with their state laws. See Mem. & Order 10–11 [Doc. No. 218]. The court also will not preliminarily enjoin implementation of the Final Rule for elections after the November 2026 election, where the Final Rule imposes no irreparable harm as to later elections and judicial challenges may be addressed in the normal course.

In sum, for the above-stated reasons, the court grants Plaintiff States' and Plaintiff Organizations' motions for a preliminary injunction as set forth below. See infra Section V.

## IV. Request for Stay

At the preliminary injunction hearing, Defendants requested a stay of any preliminary injunction the court may order.

"A stay pending appeal is an 'intrusion into the ordinary processes of administration and judicial review' and relief is not granted as 'a matter of right.'" Rhode Island, 155 F.4th at 41 (quoting New York v. Trump, 133 F.4th 51, 65 (1st Cir. 2025)). The movants "bear the burden of demonstrating that they are entitled to the 'extraordinary' relief that they seek." Id. (quoting Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 68 (1st Cir. 2025)).

[62] The strongest support in the record for the USPS's asserted policy justification are references to commenters' "differing views on the incidence of voter fraud and its impact on election integrity." 91 Fed. Reg. at 54969.

The Supreme Court has explained that movants must (1) make a strong showing that they are likely to succeed on the merits on appeal; (2) show that they will be irreparably injured absent a stay; (3) show that a stay will not substantially injure the other parties interested in the proceeding; and (4) show that the stay would be in the public interest. Nken v. Holder, 556 U.S. 418, 434 (2009). Likelihood of success and irreparable injury are "the most critical" factors. Id. "It is not enough that the [movant's] chance of success on the merits be better than negligible." Id. (citation modified). Similarly, "simply showing some possibility of irreparable injury fails to satisfy the second factor." Id. at 434–35 ( citation modified). Courts assess the harm to other interested parties and weigh the public interest "[o]nce an applicant satisfies the first two factors[.]" Id. at 435.

For the reasons discussed above, the court finds that Defendants have not made a strong showing that they are likely to succeed on the merits, have shown no irreparable injury absent a stay, have not shown that a stay will not substantially injure the other parties interested in the proceeding, and have not shown that a stay would be in the public interest. Accordingly, the request for a stay pending appeal is DENIED.

## V. Order

For the foregoing reasons, Plaintiffs' motions[63] for a preliminary injunction are GRANTED pursuant to Federal Rule of Civil Procedure 65(a) as follows.

(1) The court stays and preliminarily enjoins the implementation or enforcement of the following sections of the Final Rule as to elections occurring before or on November 3,

---

[63] Mot. for a TRO, Emergency Stay, and Expedited Prelim. Inj. and Stay, California II, No. 1:26-cv-13917 [Doc. No. 3]; Emergency Mot. for TRO and Prelim. Inj., LVWM, No. 1:26-cv-11549 [Doc. No. 206].

2026. For elections occurring before or on November 3, 2026, USPS Defendants[64] may not implement in any way and may not take any further preparatory steps to implement:

a. DMM Section 705.24.3.1, to the extent that the section makes Outbound Ballot Mail Envelope Standards and USPS review mandatory;

b. DMM Section 705.24.3.2, to the extent that the section makes Return Federal Ballot Mail Envelope Standards and USPS review mandatory;

c. DMM Section 705.24.4.1, to the extent that the section makes Postal Service Federal Ballot Mail Portal registration mandatory for Ballot Mail;

d. DMM Section 705.24.4.2, to the extent that the section makes voter enrollment in the Postal Service Federal Ballot Mail Portal mandatory for Ballot Mail;

e. DMM Section 705.24.5.1;

f. The first two sentences of DMM Section 705.24.5.2; and

g. DMM Section 705.24.5.3(a), (b), (c).

(2) Defendants' counsel must, within 24 hours after receiving service of this Order: (i) provide written notice of this Order to the USPS Defendants and their employees; (ii) notify all such recipients that they are required to comply with this Order, under penalty of contempt; and (iii) file on the docket by the next business day a copy of the notice and/or communications referred to in (i)–(ii).

---

[64] USPS Defendants are the USPS, the Postmaster General, the Deputy Postmaster General, and the members and Chair of the USPS Board of Governors. See Compl., California II, No. 1:26-cv-13917 [Doc. No. 1]; Compl., Suppl. Compl., LWVM, No. 1:26-cv-11549 [Doc. Nos. 1, 205].

(3) The Temporary Restraining Order[65] entered by the court on August 27, 2026, is hereby dissolved.

IT IS SO ORDERED.

September 4, 2026

/s/ Indira Talwani
United States District Judge

[65] Order, California II, No. 1:26-cv-13917 [Doc. No. 31]; Order, LVWM, No. 1:26-cv-11549 [Doc. No. 218].