**No. 26-2029**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS EDUCATION FUND, ASSOCIATION OF AMERICANS RESIDENT OVERSEAS, U.S. VOTE FOUNDATION, OCA-ASIAN PACIFIC AMERICAN ADVOCATES, DELTA SIGMA THETA SORORITY, INC.,
*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, UNITED STATES POSTAL SERVICE, UNITED STATES POSTAL SERVICE BOARD OF GOVERNORS, DAVID STEINER, in his official capacity as Postmaster General, DOUGLAS A. TULINO, in his official capacity as Deputy Postmaster General, AMBER F. MCREYNOLDS, in her official capacity as Chairwoman of the Board of Governors of the United States Postal Service, DEREK T. KAN, in his official capacity as the Vice Chairman of the Board of Governors of the United States Postal Service, RONALD A. STROMAN, in his official capacity as a member of the Board of Governors of the United States Postal Service, DANIEL M. TANGHERLINI, in his official capacity as a member of the Board of Governors of the United States Postal Service,
*Defendants-Appellants*,

STATE OF MISSOURI; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,
*Defendants*.

On Appeal from the United States District Court for the District of Massachusetts

**BRIEF OF NATIONAL SECURITY LEADERS FOR AMERICA AS *AMICUS CURIAE* IN OPPOSITION TO FEDERAL DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

Hassan Ahmad
*Counsel of Record*
Austin C. Schlick
Yevgeniy Pilipovskiy
Kimberly Railey
Laura Lowry
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
hahmad@cov.com

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A) and Circuit Rule 26.1, *amicus curiae* National Security Leaders for America states that it has no parent corporations and does not issue stock.

*/s/ Hassan Ahmad*
Hassan Ahmad
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................................ iv

INTEREST OF *AMICUS CURIAE* .................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

BACKGROUND ................................................................................................ 4

A. Military and Diplomatic Families Confront Unique Challenges When Voting. ..................................................................... 4

B. UOCAVA Requires that Absentee Ballots Be Made Available to Eligible Voters Who Request Them and that Those Absentee Ballots Can Be Returned and Counted. ............................................... 8

C. USPS's Final Rule Provides No Viable Process for Respecting UOCAVA's Mandates. ............................................................ 10

ARGUMENT .................................................................................................... 13

I. The Requirements of Section 3 of Executive Order 14,399 and the Final Rule Conflict with UOCAVA's Mandates to the States and the Executive Branch. ........................................................................ 14

II. Implementation of the Final Rule Would Produce Chaos in Military and Diplomatic Voting That Prevents the States from Counting Ballots of Eligible Voters. ........................................................................ 21

A. UOCAVA's Firm Deadlines Do Not Allow for Correction of the Final Rule's Inadequate Procedure for Exclusion of UOCAVA Ballots from the Enrollment-and-Barcode Regime. .......................... 22

B. Any Errors in a Rushed Rollout of the Final Rule Will Impact Those Voters Least Able to Correct Them. ....................................... 25

C. Purcell's Anti-Disruption Principle Applies with Particular Force to Military and Overseas Voters, Who Have No Opportunity to Try Again. .......... 26

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE .......... 29

CERTIFICATE OF SERVICE .......... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ....................27

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................27

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ....................27

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ....................26

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
589 U.S. 423 (2020) ....................26

*Watson v. Republican Nat'l Comm.*,
609 U.S. __, 146 S. Ct. 2165 (2026) ....................15

**Statutes**

52 U.S.C. § 20301 ....................9, 10, 15

52 U.S.C. § 20302 .................... 8, 9, 10, 15, 22, 24, 27

52 U.S.C. § 20303 ....................9

52 U.S.C. § 20304 ....................10, 12, 15, 22

Fla. Stat. § 101.68 ....................7

Ga. Code § 21-2-386 ....................7

Ga. Code § 21-2-419 ....................7

Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84,
123 Stat. 2190 (2009) ....................8

Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No.
99-410, 100 Stat. 924 (1986) ....................2

**Regulatory Materials**

Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026)..................16

Ballot Mail for Federal Elections, 91 Fed. Reg. 54,966 (Aug. 26, 2026)........................................... 2, 11, 12, 15, 17, 18, 20, 21, 23, 24

Comment of National Security Leaders for America to the United States Postal Service Proposed Rule Amending the Domestic Mail Manual Regarding the Transmission of Mail-In or Absentee Ballots for Federal Elections (July 1, 2026) ...............................................20, 21

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (2026) ..................7, 2, 10, 15, 23, 24

**Other Authorities**

Camilla Rodriguez Guzman, *Serving in the Military Shouldn't Mean It's Harder to Vote*, Nat'l Conf. of State Legis. (Aug. 26, 2025).........................7

Fed. Voting Assistance Prog., *State of the Military Voter* (archived July 29, 2026)..........................................................................................5

Fed. Voting Assistance Prog., *2026–27 Voting Assistance Guide* (Oct. 2025) ....................................................................................7, 22, 24

Fed. Voting Assistance Prog., *Issue Brief: Ballot Outcomes by Ballot Receipt Date* (archived Aug. 25, 2026) ...............................................................8

H.R. Rep. No. 99-765 (1986).........................................................4, 5, 28

Mariel Padilla, *If You're in the Military, Voting This Year Could Be Tricky*, The 19th (July 12, 2024) .....................................................................6

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025) ...........................................5

U.S. Gov't Accountability Off., GAO-25-107098 Highlights, *State Department: Spending on Pay, Benefits, and Allowances for Overseas Employees* (Dec. 19, 2024) ...............................................................5

USPS, *Intelligent Mail Barcode*, https://perma.cc/Z3WB-WVZ8 ..........................20

USPS Office of Inspector General, *Audit Report: Manual Mail Processing Efficiency* (Sep. 21, 2021)..................................................19

*Why the Wait? Unpacking California's Untimely Election Counting Process*: *Hearing Before the Comm. on H. Admin.*, 119th Cong. (2025) ........................................ 6

## INTEREST OF *AMICUS CURIAE*[1]

National Security Leaders for America ("NSL4A") is a non-partisan network of over 1,500 former senior military and civilian leaders possessing broad experience in national security issues and sharing viewpoints and affiliations from across the political spectrum. Over 800 of NSL4A's members are retired Generals, Admirals, or other senior officers from one of the uniformed services of the United States. Approximately 200 of its members served as ambassadors of the United States in foreign countries, while many more served in senior diplomatic posts around the world.

This extensive service to our country has afforded many NSL4A members first-hand experience with the difficulties military and diplomatic personnel, and their families, encounter in casting ballots when on assignment abroad or in the United States away from their legal residences. NSL4A can assist the Court to understand the harms that will be inflicted upon the voting rights of uniformed military members, diplomats, and their families by the restrictive policies announced in Executive Order 14,399 of March 31, 2026, 91 Fed. Reg. 17,125, and the United States Postal Service's ("USPS") Final Rule, Ballot Mail for Federal Elections, 91

[1] All parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), *amicus* affirms that no counsel for a party authored this brief in whole or in part, and that no person other than *amicus* or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

Fed. Reg. 54,966 (Aug. 26, 2026) (to be codified at 39 C.F.R. pt. 111) ("Final Rule"). The Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, 100 Stat. 924 (1986) ("UOCAVA") was enacted to protect the absentee voting rights of uniformed and overseas voters. NSL4A and its members can describe to the Court how Executive Order 14,399 and the Final Rule conflict with the protections Congress afforded to voters in federal service under UOCAVA.

NSL4A members have experienced firsthand the importance of timely delivery of UOCAVA ballots to voters, their successful return to election offices, and accurate tabulation of these ballots. NSL4A can provide a unique and meaningful perspective to ensure that UOCAVA voters can exercise their fundamental right to access the ballot box and have their votes counted. NSL4A is not aware of any party or court having addressed these issues in the instant or related litigation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government's Emergency Motion for Stay Pending Appeal ("Motion") claims the Final Rule violates no state law. Motion at 18. But it ignores the requirements that UOCAVA imposes on the States to protect the voting rights of UOCAVA voters. Congress enacted UOCAVA to ensure that military personnel and their family members serving or living away from their voting residence, as well as diplomats and other American citizens living overseas, are able to have their votes

counted despite the delays and practical barriers inherent in voting away from their legal residences. Section 3 of Executive Order 14,399 directs USPS to impose a new barcode-and-enrollment regime for ballot mail, implemented on a compressed election-year timeline, that would interfere with the protections Congress guaranteed UOCAVA voters. Although the Final Rule nominally purports to exempt UOCAVA ballots from its implementation of Section 3's unlawful requirements, the exclusion is neither developed nor workable. Confirming that the Final Rule's exclusion for UOCAVA ballots is fictional, the Government's Motion omits any mention of it. The Government thus leaves the *admitted conflict* between UOCAVA and the Postal Service's ballot-blocking policy entirely unaddressed.

This Court should decline to stay the District Court's preliminary injunction enjoining implementation of the Final Rule for multiple reasons, including two of particular significance to UOCAVA voters.

*First*, the Final Rule is *ultra vires* and cannot be lawfully implemented because it would impose envelope formatting requirements on the States that UOCAVA expressly prohibits. The Final Rule provides no plausibly effective procedures by which USPS can ensure that ballots mailed to or returned by UOCAVA voters will not be rejected as noncompliant under the Final Rule's barcode-and-enrollment policy.

*Second*, implementation of the Final Rule would inject confusion and

operational disruption into military and diplomatic and other overseas voting at the very time when State officials, under express requirements of the statute, must distribute, receive, and count UOCAVA ballots. The processes prescribed to protect UOCAVA voters preclude any realistic conclusion that there will be adequate time to resolve the conflicts and uncertainties associated with the Final Rule's ballot procedures before the November 3, 2026, general election. Accordingly, allowing USPS to implement the Final Rule would create an imminent risk that military personnel and their families serving away from their legal residences and diplomats and other eligible voters living abroad will be effectively disenfranchised.

## BACKGROUND

### A. Military and Diplomatic Families Confront Unique Challenges When Voting.

For as long as the United States has sent her citizens to serve at geographically dispersed domestic and overseas military installations and diplomatic postings, military members and diplomatic personnel, along with their family members, have confronted unique challenges in casting their ballots. Stationed hundreds or thousands of miles from home, military members often serve in remote areas with slow or sporadic mail service. H.R. Rep. No. 99-765, at 10 (1986). They may also be away from their posts for days or weeks at a time. *Id.* For this group, voting by absentee ballot is frequently the only feasible way to exercise their democratic right. As Congress has noted, "[w]hen overseas voters fail to receive their absentee ballots

in time to vote and return them, they are clearly and effectively disenfranchised." *Id.* at 12.

These issues are not abstract. Many of the estimated 1.31 million active-duty members and roughly 549,000 military spouses and voting-age dependents are assigned to areas away from their legal voting residence. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 194–95 (2025) ("2024 Report"), https://perma.cc/SE86-6WBP. Thousands of diplomatic personnel staff hundreds of foreign U.S. posts. *See* U.S. Gov't Accountability Off., GAO-25-107098 Highlights, *State Department: Spending on Pay, Benefits, and Allowances for Overseas Employees* (Dec. 19, 2024), https://perma.cc/ZF5F-EPPH. In practice, most of these voters use the postal system to cast their ballots. In the 2024 general election, 65.8 percent of absentee ballots returned and submitted by military and overseas voters arrived via postal mail. 2024 Report at 204.

Yet even with the hundreds of thousands of military and diplomatic ballots mailed out each year, these voters continue to face particular challenges. In 2024, 15 percent of military voters reported they did not receive their ballot in time or that their ballot never arrived. Fed. Voting Assistance Prog. ("FVAP"), *State of the Military Voter* (archived July 29, 2026), https://perma.cc/DRT6-2X8U. Even voters who do receive ballots have reported that their ballots were never counted. In the

2020 election, for instance, one military spouse stationed in Japan requested an absentee ballot and mailed it back to her home state of South Dakota the day after she received it. Mariel Padilla, *If You're in the Military, Voting This Year Could Be Tricky*, The 19th (July 12, 2024), https://19thnews.org/2024/07/military-voting-challenges-election-2024/. When the voter went to check her ballot identification number on the county supervisor's website, a notification stated her ballot had been "received but not counted." *Id.* She contacted the county supervisor of elections by email but never heard back. *Id.* Being thousands of miles away from home in connection with her spouse's posting, the voter was unable to resolve her voting issue in person and was unable to have her ballot counted. She was disenfranchised.

As mail ballots are initially sent to the voter and then returned to election officials, delays and other issues arise for two principal reasons. First, due to the distance some of these ballots must travel, military and diplomatic voters can confront condensed timelines to receive and return their ballots. Mail to military families stationed abroad commonly can take six to eight weeks to arrive. *See Why the Wait? Unpacking California's Untimely Election Counting Process*: *Hearing Before the Comm. on H. Admin.*, 119th Cong. 26–27 (2025) (statement of Rebecca Nowatchik, Dir. of External P'ships, Secure Families Initiative), https://perma.cc/JSZ6-485C. In an apparent acknowledgment of mail delays, UOCAVA voters are advised to return their ballots as early as 30 or 35 calendar days

before Election Day. *See* FVAP, *2026–27 Voting Assistance Guide* 10 (Oct. 2025), https://perma.cc/KG45-TMBD.

Second, military members and diplomats may have transient posts, further complicating ballot delivery. A 2025 media report highlighted the case of a Navy sailor whose post was "essentially his ship." Camilla Rodriguez Guzman, *Serving in the Military Shouldn't Mean It's Harder to Vote*, Nat'l Conf. of State Legis. (Aug. 26, 2025), https://perma.cc/G7FB-4MU8. The sailor requested an absentee ballot for the 2024 presidential election, but the ballot "never made it through the mail" due to processing problems, preventing him from voting. *Id.*

Furthermore, some States provide voters only a very brief window after Election Day to fix a missing or mismatched signature on a mail ballot. In Florida and Georgia, for example, military voters whose absentee ballots are rejected because of a signature or verification issue have only until the second or third day after the election, respectively, to provide the required affidavit and personal identification to cure the ballot. Fla. Stat. § 101.68; Ga. Code §§ 21-2-386, 21-2-419. For military and overseas voters, these compressed deadlines can be impossible to meet. Notifications may arrive late, and the voters may be in service away from their mailing address when the notification comes.

A recent report by the Federal Voting Assistance Program highlights these obstacles, noting that "[w]hen a ballot is received too close to Election Day, there

may not be sufficient time to resolve errors, and a ballot that might have otherwise been counted if the issue had been fixed is ultimately rejected." FVAP, *Issue Brief: Ballot Outcomes by Ballot Receipt Date* 2 (archived Aug. 25, 2026), https://perma.cc/DQ35-H762. And the problem is becoming more severe. In the 2024 federal elections, the overall rejection rate for regular absentee ballots submitted by UOCAVA voters was 3.7 percent—a 77 percent increase from the 2.1 percent reported in 2020. 2024 Report at 206.

In short, military members and diplomatic personnel commonly must cast their votes by mail, and they face elevated barriers when doing so. Faithful implementation of protective laws like UOCAVA is critical to ensuring these individuals can successfully exercise their franchise.

### B. UOCAVA Requires that Absentee Ballots Be Made Available to Eligible Voters Who Request Them and that Those Absentee Ballots Can Be Returned and Counted.

Generally, UOCAVA requires States to permit covered voters "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). As amended through the Military and Overseas Voter Empowerment Act (MOVE Act), Pub. L. No. 111-84, Subtitle H, §§ 575–89, 123 Stat. 2190, 2318–35 (2009), UOCAVA requires that (absent a hardship exemption) when the request for an absentee ballot is received at least 45 days before the election, States must "transmit

a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election." 52 U.S.C. § 20302(a)(8). For the November 3, 2026, general election, that date is September 19, 2026. In practical effect, therefore, UOCAVA requires State procedures for absentee voting to be established and operational significantly in advance of 45 days before the election, that is, well before September 19 of this year.

As to registration and application, UOCAVA requires States to accept any valid voter registration application and absentee ballot application received at least 30 days before any election. *Id.* § 20302(a)(2). For the upcoming general election, therefore, States must accept registrations and absentee ballot applications as late as October 4, 2026. In addition to any method of registering to vote or applying for an absentee ballot prescribed by the States, UOCAVA further requires States to accept and process "an official post card form, containing both an absentee voter registration application and an absentee ballot application" prescribed by federal authorities. *Id.* §§ 20301(b)(2), 20302(a)(4). UOCAVA also provides for a "Federal write-in absentee ballot . . . for use in general, special, primary, and runoff elections for Federal office by . . . voters who make timely application for, and do not receive, States['] absentee ballots." *Id.* § 20303(a)(1). Among other requirements, UOCAVA requires the States to establish procedures to enable covered voters to request and receive voter registration and absentee ballot applications by mail or

electronically, *id.* § 20302(a)(6)(A)–(B), and to transmit "blank absentee ballots" to eligible voters "by mail and electronically," *id.* § 20302(a)(7). The Executive Branch must assist the States' fulfillment of their duties to facilitate the mailing of covered ballots. *Id.* § 20301.

As to ballot collection and delivery of marked ballots, UOCAVA requires federal authorities to implement procedures for collecting and facilitating the delivery of marked absentee ballots "to the appropriate election officials" "not later than the date by which an absentee ballot must be received in order to be counted in the election." *Id.* § 20304(a)–(b). For these purposes, UOCAVA directs federal authorities to "cooperat[e] and coordinat[e] with" USPS to "provide expedited mail delivery service for all such marked absentee ballots . . . that are collected on or before the [prescribed] deadline." *Id.* § 20304(b). Absent an applicable exception, the prescribed collection deadline "is noon (in the location in which the ballot is collected) on the seventh day preceding the date of the regularly scheduled general election for Federal office." *Id.*

### C. USPS's Final Rule Provides No Viable Process for Respecting UOCAVA's Mandates.

On August 26, 2026, USPS published its Final Rule to implement Executive Order 14,399. Acknowledging that Section 3 of the Executive Order conflicts with UOCAVA's mandate to facilitate expedited delivery of UOCAVA ballots, the Final Rule purports to exempt UOCAVA ballots from its conditions. 91 Fed. Reg. at

54,988. Under the Final Rule, UOCAVA outgoing and return envelopes formally need not bear the machine-readable barcodes required for other absentee ballots. Yet USPS established no processing procedures to ensure outbound UOCAVA ballots are delivered to voters despite the new delivery restrictions the Final Rule imposes on all other federal election mail. Nor does USPS have any stated method to ensure that return ballots from UOCAVA voters will be delivered for tabulation when those ballots would be rejected for other mail-in voters due to the absence of machine-readable markings on their return envelopes.

Remarkably, USPS took the position that these practical issues of fundamental importance to UOCAVA voting—which NSL4A and other commenters raised as concerns in response to USPS's proposed rule—did not even have to be considered in the Final Rule or included in the revised Domestic Mail Manual ("DMM") provisions. *See* 91 Fed. Reg. at 54,988 (noting that commenters "asked for more assurances and safeguards to ensure UOCAVA ballots would not be impacted by the rule, as errors could occur that would accidentally apply the rule's standards to UOCAVA ballots" and further "sought clarification on how the Postal Service would distinguish between ballots sent pursuant to UOCAVA and other mail-in or absentee ballots"). "[O]perational changes or service commitments for ballots mailed to and from military and overseas voters," USPS responded, "are beyond the scope of this proceeding and will not be addressed." *Id.* at 54,968.

Instead of establishing mail-handling procedures to expedite delivery of UOCAVA ballots consistent with 52 U.S.C. § 20304, the commentary to the Final Rule assumes that USPS will be able to identify and exempt many thousands of individual pieces of outbound and return UOCAVA ballot mail based on the franking language that exempts the mail from postage requirements, *i.e.*, language on the envelopes stating ‘‘No Postage Necessary in the U.S. Mail—DMM 703.8.0” or ‘‘U.S. Postage Paid 39 U.S.C. 3406.’’ 91 Fed. Reg. at 54,988. At the same time, though, USPS recognizes that its proposed automated reading and sorting technology would reject UOCAVA envelopes with only these envelope markings because they are not machine readable: USPS's only solution for outgoing ballot mail is to require that election officials segregate their outbound UOCAVA ballots from other ballots so that the UOCAVA ballots can be "properly accepted" at the Post Office. *Id.* New section 705.24.5.2 of the DMM confirms this reliance on manual sorting, stating that election officials must present their outbound UOCAVA ballot mail at a USPS facility and the exempt mail will be "verified by Postal Service employees when presented for acceptance." *Id.* at 54,991. Even more alarming, the Final Rule is entirely silent about procedures for handling return ballots mailed by UOCAVA voters that are unacceptable for delivery under the Final Rule's barcode-and-enrollment procedures.

Events in this case highlight USPS's dismissal of UOCAVA. On September

3, 2026, the Government submitted in the District Court below the Declaration of Steven W. Monteith, the Chief Customer and Marketing Officer and Executive Vice President of USPS (Document 280-1). Mr. Monteith's Declaration addresses the operational steps USPS is taking to implement the Final Rule. It states without qualification that USPS is implementing a policy under which ballot mail must "be mailed in an envelope that (a) includes the official Election Mail logo; (b) is automation compatible; (c) bears a unique IMb with the Delivery Point Zip Code embedded and a Federal Ballot Mail Service Type Identifier (STID); and (d) has undergone review by the Postal Service for mailpiece design and barcode placement." *Id.* ¶ 7. Mr. Monteith provided no detail on how the Final Rule's purported exception for UOCAVA ballots would be implemented and (like the Government in its Motion) evinced no awareness of it. The Government's utter disregard for UOCAVA in this case highlights the near certainty that, if the requested stay is granted, in the November 2026 election USPS will reject ballots UOCAVA requires it to deliver.

## ARGUMENT

The Respondent States collectively are home to hundreds of thousands of UOCAVA voters. For example, in 2024 California reported having 165,341 UOCAVA voters, Virginia reported 174,315 such voters, and Washington State reported 124,410 such voters. 2024 Report at 210–11. The Government's Motion

asserts repeatedly that the Final Rule is a "modest" mail-handling policy and not a substantive elections policy. Motion at 4, 5, 7, 10, 16, 17, 18. But as explained below, implementation of the Final Rule would directly, immediately, and irrevocably interfere with the States' fulfillment of their obligations to these UOCAVA voters. The preliminary injunction entered by the District Court is necessary to prevent this certain harm to the Respondent States and their uniformed service members and other citizens abroad.

## I. The Requirements of Section 3 of Executive Order 14,399 and the Final Rule Conflict with UOCAVA's Mandates to the States and the Executive Branch.

The Government denies that any special statutory provisions apply to its processing of federal ballot mail. "[E]lection-related mail," the Government asserts, is legally no different than other mail and thus "fully consistent with USPS's statutory and constitutional authority" to manage and regulate mail delivery. Motion at 2, 5, 11. This is flatly wrong. To the contrary, Section 3 of the Executive Order and the Final Rule implementing it are irreconcilable with UOCAVA's specific commands governing expedited delivery of all properly marked military and overseas ballots.

Section 3 directs that USPS "shall" specify "that all outbound ballot mail must be mailed" in an envelope that must, among other requirements, be "marked as Official Election Mail" and "bear[] a unique Intelligent Mail barcode ["IMb"] or

successor USPS technology." Exec. Order No. 14,399, § 3(b)(i)(A)–(B), 91 Fed. Reg. 17,125, 17,126 (2026). Return ballots mailed by voters must not be delivered to election officials unless USPS determines the voter is on an approved list as identified by a machine-readable barcode on the return envelope. *See id.* § 3(b)(iii); 91 Fed. Reg. 54,991 (DMM 705.24.5.3.a).

Under UOCAVA, however, States "shall not refuse to accept and process" an otherwise valid marked absentee ballot "solely on the basis of" "[r]estrictions on . . . envelope type." 52 U.S.C. § 20302(i), (i)(3). The Federal Government, including USPS, must support the States' fulfillment of their obligation to accept ballots. *Id.* §§ 20301, 20304. These requirements leave no room for a USPS verification standard that interferes with the delivery of a covered ballot due to the absence of an acceptable voter barcode. To the contrary, as the Supreme Court recently explained, "UOCAVA repeatedly presupposes that ballot receipt is a matter of state law." *Watson v. Republican Nat'l Comm.*, 609 U.S. __, 146 S. Ct. 2165, 2173 (2026).

Under Section 3 and DMM 705.24.3.1.c and 705.24.5.1 (governing outbound mail), a UOCAVA ballot Congress has specifically directed the States to accept regardless of its envelope type is precisely the kind of mailing that USPS is likely to reject under the Final Rule. *See* 52 U.S.C. § 20302(i), (i)(3) (prohibiting refusal to accept applications based on envelope type). If these provisions are applied to military and other covered ballots, then the Final Rule will prevent the States from

satisfying their obligations under UOCAVA and abrogate the Executive Branch's own duties under that law. Unlike the Government's current Motion for a Stay, USPS's commentary to its rule at least acknowledges that Section 3 of the Executive Order and the Final Rule's ballot-rejection procedures conflict with UOCAVA. USPS purported to resolve the problem by declaring that the new rule's provisions "do not apply to ballots covered under the Uniformed and Overseas Citizens Absentee Voting Act." Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915, 32,915–32,916 (June 2, 2026) (proposed rule). As explained below, though, the actual text of the Final Rule and revised DMM cannot be harmonized with UOCAVA's explicit statutory requirement that States must accept a properly marked UOCAVA ballot regardless of other envelope features. Moreover, the Final Rule commentary assumes a wholly unrealistic process by which UOCAVA outgoing and return ballots would be reviewed and accepted for delivery by hand, despite not providing any procedure for staffing or training for such tasks at each individual post office. Against the Final Rule's general policy that is intended to lead to automated rejection and non-delivery of certain ballot mail, USPS has failed to establish any plausibly reliable process for ensuring that outbound UOCAVA ballots without an acceptable IMb barcode are delivered from election offices to mail-in voters. And there are no procedures at all to prevent rejection of UOCAVA return mail from

voters back to their home election offices.

Specifically, the Final Rule requires that "[o]utbound Federal Ballot Mail must be mailed in an envelope that . . . [b]ears a unique IMb with the Delivery Point ZIP Code embedded and a Federal Ballot Mail Service Type Identifier." 91 Fed. Reg. at 54,990 (amending DMM 705.24.3.1.c). The Final Rule nevertheless asserts, without any significant explanation, that USPS will correctly identify and exempt outbound UOCAVA mail that does not contain the IMb based on envelope franking language that states ''No Postage Necessary in the U.S. Mail—DMM 703.8.0" or ''U.S. Postage Paid 39 U.S.C. 3406." 91 Fed. Reg. at 54,988. USPS supposedly, in some undisclosed manner, "will review mailings identified as Outbound Federal Ballot Mail prior to acceptance to evaluate whether the mailing meets the standards in 24.3.1 and is being sent to individuals who have been enrolled . . . on the state's Mail-In and Absentee Participation List," *id.* at 54,991 (DMM 705.24.5.1)—a review USPS elsewhere describes as "checking the outbound barcode," *id.* at 54,969. Any mailing that does not pass this review "will not be accepted and will be returned to the authorized ballot mailer." *Id.* at 54,991 (DMM 705.24.5.3.a).

The Final Rule provides that States' return ballots for voters to mail "must meet" similar barcoding and formatting requirements. *Id.* (DMM 705.24.3.2 (Return Federal Ballot Mail Envelope Standards) & DMM 705.24.4.2.f (requiring certification of compliance with standards for return ballots)). USPS will rely on

"mailpiece design review" to clear return ballots. *Id.* (DMM 705.24.3.2c). Critically, the Final Rule provides no provision for how postal personnel will handle UOCAVA return ballots that lack the required barcode. Again, USPS's September 3 Declaration on implementation of the Final Rule and the Government's instant Motion entirely ignore the subject.

USPS's claimed exemption for UOCAVA ballots is an empty promise. In its commentary supporting the Final Rule, USPS instructs that outbound ballots "should be segregated from Outbound Federal Ballot Mail when presented for mailing." 91 Fed. Reg. at 54,988. USPS further suggests that UOCAVA ballot envelopes can be singled out for delivery by the presence of unique envelope markings, *i.e.*, language on the envelopes stating ''No Postage Necessary in the U.S. Mail—DMM 703.8.0" or ''U.S. Postage Paid 39 U.S.C. 3406.'' *Id.* In doing so, USPS implicitly confirms that its automated technology will not recognize the UOCAVA franking language that USPS now deems critical—while providing no other mechanism or safeguards for ensuring delivery of UOCAVA ballots that lack acceptable IMb barcodes.

While the Final Rule relies on election officials to pre-sort their outbound UOCAVA mail and on postal workers to manually recognize and correctly deliver outbound UOCAVA ballots, the Final Rule and its commentary provide no guidance on how return UOCAVA ballots will be processed. Perhaps if USPS had addressed the issue, it would have argued that manual inspection of UOCAVA return

envelopes by some postal employee, at some point during their journey, will identify the presence of the UOCAVA frank on the envelopes so that the ballots can be delivered timely for tabulation. But without any provision in the DMM for immediately inspecting every rejected return ballot to ensure it is not a UOCAVA ballot that must be delivered in a timely fashion, this is simply speculation.

The Postal Service's own documents reflect that manual verification of acceptable UOCAVA mailings will not be workable or timely. USPS's Inspector General (among others) has highlighted the inaccuracies and delays inherent in manual mail processing of the sort USPS appears to contemplate for UOCAVA mail. With respect to manual package operations, for instance, the Inspector General noted that "management did not always ensure packages were scanned to capture the number of mailpieces processed manually," resulting in inaccurate counts of manually processed mail. USPS Office of Inspector General, *Audit Report: Manual Mail Processing Efficiency* 12 (Sep. 21, 2021), https://perma.cc/6USE-DMJS. Further, the Inspector General's report emphasized that manual processing is "less productive" than automated processing and can hinder "prompt, reliable, and affordable mail service." *Id.* at 1. The Final Rule entirely fails to address how manual procedures for UOCAVA ballot mail would avoid the difficulties that bedevil other manually processed mail.

As the Final Rule suggests, USPS's automated sorting technology operates by

reading barcodes—not by reading the franking language USPS claims will identify UOCAVA mail. *See* 91 Fed. Reg. at 54,988; USPS, *Intelligent Mail Barcode*, https://perma.cc/Z3WB-WVZ8 (stating the IMb is "used to sort and track letters, cards and flats"). A return ballot mailed by a UOCAVA voter in a plain envelope without an IMb will thus be indistinguishable to USPS's automated systems from a non-compliant ballot subject to rejection under the Final Rule. USPS has provided no training protocols, technological solutions, or operational guidance to ensure that postal workers will recognize UOCAVA ballots without IMbs as exempt and route them to the appropriate election office. *See* Comment of National Security Leaders for America to the United States Postal Service Proposed Rule Amending the Domestic Mail Manual Regarding the Transmission of Mail-In or Absentee Ballots for Federal Elections at 4 (July 1, 2026) ("NSL4A Comment") (noting that "the Proposed Rule identifies no training program or implementation guidance to ensure the consistent treatment of UOCAVA ballots").

The NSL4A Comment specifically raised these issues, warning that because UOCAVA voting envelopes "would not meet the requirements of proposed rules DMM 24.3 and 24.4 . . . neither the outgoing absentee ballot nor the returned cast ballot would contain the unique, computer readable code required to enable the USPS to complete the mailing and receipt of absentee ballots from UOCAVA voters." NSL4A Comment at 4. NSL4A further observed that while the identifiers

on UOCAVA ballot envelopes "could identify whether those envelopes are going to and coming from a UOCAVA voter, they are not machine readable," meaning that "USPS employees would need to identify and distinguish UOCAVA ballot materials manually." *Id.* And NSL4A raised the substantial practical constraints USPS would face in uniformly implementing these practices, noting the challenges of training a massive workforce of over 624,000 postal service employees who process billions of pieces of mail annually.

In issuing its Final Rule, USPS did not address, much less resolve, these critical concerns. Instead, USPS asserted that these plainly relevant issues exceeded the scope of its rulemaking and no detailed procedures for processing UOCAVA mail are needed. 91 Fed. Reg. at 54,968. USPS's lack of a response makes it impossible to conclude that the Final Rule will be implemented consistent with UOCAVA.

## II. Implementation of the Final Rule Would Produce Chaos in Military and Diplomatic Voting That Prevents the States from Counting Ballots of Eligible Voters.

UOCAVA's statutory deadlines leave no room to repair or revise the untested manual processing process and unlawful barcode requirement the Final Rule would in practical effect impose on UOCAVA ballots. The harms from the resulting election-administration disruption would fall hardest on the voters least equipped to bear it—service members and their families, diplomatic personnel, and other eligible

voters overseas who cannot appear at a polling place or easily correct an erroneous voter record from their domestic or overseas assignment, and who have no practical opportunity to recast or otherwise remedy a ballot rejected under the Final Rule. These are the very voters whose rights Congress sought to protect by enacting UOCAVA.

### A. UOCAVA's Firm Deadlines Do Not Allow for Correction of the Final Rule's Inadequate Procedure for Exclusion of UOCAVA Ballots from the Enrollment-and-Barcode Regime.

As explained above, UOCAVA requires States to transmit ballots to covered voters no later than September 19, 2026 (45 days before the election per 52 U.S.C. § 20302(a)(8)), while continuing to accept valid registration forms and ballot requests submitted as late as 30 days before that election, *id.* § 20302(a)(2), and further to ensure that completed ballots reach election officials by the deadline generally applicable under State law, *id.* § 20304(b)(1). Once a ballot is transmitted by State election officials, military and overseas voters must return it—often across international mail systems—in sufficient time for it to arrive by Election Day; the Federal Voting Assistance Program accordingly instructs voters to mail their ballots back 30 to 35 days before Election Day. FVAP, *2026–27 Voting Assistance Guide* 10.

Section 3's architecture wreaks havoc on that timeline. The Executive Order provides that a State choosing to submit a list of voters eligible to vote by mail can

do so up to 60 days before the election. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126. (That date—September 4th—has now passed.) Earlier submission, although technically permitted, would compound the risk of an incomplete or inaccurate list. The Final Rule separately requires the State officials enrolling individual voters with USPS to submit that voter-specific enrollment data "at least 30 days before the date of the federal election, to the extent practicable, or by the date on which mail-in or absentee ballots may begin to be mailed under state law," with supplemental submissions permitted only "until the last day that ballots may be mailed out . . . under state law." 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d).

The fundamental problem is that, while Congress established early deadlines for UOCAVA procedures to avoid ballot-processing issues and facilitate overseas voting, the Executive Order and Final Rule set a highly compressed schedule to force their new ballot-rejection procedures into the November 2026 election cycle. The table below illustrates the incompatible schedules imposed on the States by UOCAVA and the Final Rule.

| **Days Before Election (Date in 2026)** | **UOCAVA** | **Section 3 / Final Rule** |
|---|---|---|
| **90 days** (Aug. 5, 2026) | | States *may* notify USPS of intent to use the mail for federal ballots. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126; 91 Fed. Reg. at 54,990 (DMM 705.24.2). |

| | | |
|---|---|---|
| **60 days** (Sept. 4, 2026) | | States choosing to submit an eligible-voter list to USPS must do so. Exec. Order § 3(b)(ii), 91 Fed. Reg. at 17,126. |
| **45 days** (Sept. 19, 2026) | States **must transmit** ballots to UOCAVA voters by this date. 52 U.S.C. § 20302(a)(8). | The Final Rule's voter-specific enrollment deadline (30 days) has **not yet arrived** — meaning a ballot UOCAVA requires be mailed *today* may not yet carry the enrollment data or barcode Section 3 will require for acceptance. 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d). |
| **30 days** (Oct. 4, 2026) | States must accept UOCAVA registration forms and ballot requests submitted this late. 52 U.S.C. § 20302(a)(2).<br><br>FVAP instructs voters to mail back **completed ballots** by this date. FVAP, *2026–27 Voting Assistance Guide* 10. | Final Rule's deadline for USPS enrollment-data submission. 91 Fed. Reg. at 54,991 (DMM 705.24.4.2.d). USPS will also verify barcode/ enrollment before accepting Return Federal Ballot Mail. *Id.* (DMM 705.24.5.1). |

As the table shows, allowing the Final Rule to take effect for the upcoming November 2026 elections would oblige the States, along with USPS and thousands of local election offices, to implement the novel enrollment-and-barcode system—including its undeveloped exclusion for UOCAVA ballots—exactly when the States must already be printing, addressing, and transmitting UOCAVA ballots to voters at duty stations and diplomatic posts around the country and the globe. *Cf.* Exec. Order § 3(d), 91 Fed. Reg. at 17,127 (setting a July 29, 2026, deadline for any final rule). It is simply unworkable for the States and USPS simultaneously to comply with

UOCAVA and the Final Rule.

### B. Any Errors in a Rushed Rollout of the Final Rule Will Impact Those Voters Least Able to Correct Them.

As explained above, nearly two million active-duty members, military spouses, and voting-age dependents are stationed away from their legal voting residence, and this population moves with a frequency uncommon to civilian voters domiciled in the United States, often relocating under orders that provide little notice and no latitude in execution. Even under existing procedures, UOCAVA voters are encouraged to submit a new Federal Post Card Application ("FPCA") every January and every time they move to reduce the possibilities of error and delay. If the Final Rule is precipitously implemented for the November 2026 elections, the States will have little practical ability to educate their military and diplomatic voters stationed outside the jurisdiction about the applicable UOCAVA procedures, to help these voters navigate an unfamiliar enrollment process that will be layered atop their existing FPCA obligations, or to correct registration errors before the relevant cutoff date. These difficulties are exacerbated by an undisputed reality: Most election jurisdictions design and print their mail ballot envelopes well in advance of an election, leaving little or no time to accommodate a late-breaking change in USPS's treatment of UOCAVA mail. *See* Motion at 16–17.

Meanwhile, postal employees will be tasked, for the first time and on a compressed timeline, with manually distinguishing UOCAVA-covered mail from

other mail-in ballots subject to the new barcode-and-enrollment verification standard by visually inspecting envelopes for the presence of unique UOCAVA frankings. The inevitable confusion will arise and intensify as UOCAVA's 45-day transmission deadline and 30-day registration and ballot-request deadlines approach, leaving no opportunity for course correction once the rollout begins. A rushed, bifurcated system administered nationwide across thousands of postal facilities during the run-up to a federal election is certain to cause grave operational disruption to State voting procedures and will cause UOCAVA voters to forgo their Constitutional right to vote.

### C. Purcell's Anti-Disruption Principle Applies with Particular Force to Military and Overseas Voters, Who Have No Opportunity to Try Again.

The Supreme Court has long cautioned that federal courts should be wary of contributing to last-minute changes in election rules that risk voter confusion and disenfranchisement. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424–25 (2020) (per curiam) (staying order that altered election procedures shortly before an election). The *Purcell* principle counsels denying the requested stay. The District Court's preliminary injunction preserves the ballot-mail procedures under which States, USPS, and voters have operated for decades, whereas allowing implementation of the Final Rule to go forward would introduce the kind of late-

breaking change *Purcell* warns against on a nationwide scale, shortly before the November election.

*Purcell*'s concern has particular force for military and diplomatic personnel and their families. A domestic voter whose mail ballot is rejected retains some recourse; she may vote in person, seek a provisional ballot, or return to her local election office to resolve a registration problem before Election Day. A UOCAVA voter may have none of these options. She cannot appear at a polling place thousands of miles away, and once her ballot is transmitted under the schedule UOCAVA requires, *see* 52 U.S.C. § 20302(a)(8), the calendar ordinarily leaves no time to receive a rejection notice, obtain a compliant envelope or enrollment, and return a replacement ballot before its deadline. As this Court's sister circuits have recognized in analogous contexts, once a ballot deadline has passed, there is "no do-over." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see also Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (emphasizing that election officials and voters alike need stability, not last-minute change, as an election approaches). For a UOCAVA voter, a mid-cycle change to the rules governing ballot acceptance is not an inconvenience to be managed. It is the loss of a vote that cannot be recovered.

Implementation of the Final Rule thus risks precisely the harm UOCAVA was

enacted to prevent: States failing to count the votes of military members and diplomatic personnel serving their country at distant posts, as well as the votes of their family members, due to mailing obstacles. *See* H.R. Rep. No. 99-765, at 12 (overseas voters who fail to receive or return their ballots in time are "clearly and effectively disenfranchised"). Because that harm is concrete, imminent, and beyond any court's power to undo after the fact, the District Court properly entered a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Emergency Motion for Stay Pending Appeal should be denied.

Respectfully submitted,

September 8, 2026

*/s/ Hassan Ahmad*

Hassan Ahmad
*Counsel of Record*
Austin C. Schlick
Yevgeniy Pilipovskiy
Kimberly Railey
Laura Lowry
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
hahmad@cov.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit of Federal Rules of Appellate Procedure 5(c), 29(a)(5), and 29(b)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,407 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO Version 2606 in 14-point Times New Roman font for the main text and footnotes.

Dated: September 8, 2026

*/s/ Hassan Ahmad*
Hassan Ahmad
*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I, Hassan Ahmad, an attorney, hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on September 8, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 8, 2026

*/s/ Hassan Ahmad*
Hassan Ahmad
*Counsel for* Amicus Curiae